J-S74026-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TROY ECHOLS | |
| Appellant | No. 2234 EDA 2015 |

Appeal from the Judgment of Sentence August 29, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0011834-2013
CP-51-CR-0011835-2013

BEFORE: OTT, J., RANSOM, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OTT, J.:                           **Filed January 17, 2017**

Troy Echols appeals from the judgment of sentence imposed August 29, 2014, in the Philadelphia County Court of Common Pleas. The trial court sentenced Echols to an aggregate term of eight to 20 years' imprisonment following his non-jury conviction of attempted murder,[1] aggravated assault,[2] and related charges for his attack of two individuals.[3]  On appeal, Echols

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 901, 2502.

[2] 18 Pa.C.S. § 2702(a)(1).

[3] Although the incidents occurred at the same time, Echols was charged under two separate informations.  **See** Docket No. 11834-2013 (victim Clarence Green) and Docket No. 11835-2013 (victim K.H.).  The cases were consolidated for trial.
*(Footnote Continued Next Page)*

challenges both the sufficiency and weight of the evidence supporting his convictions, and argues his sentence for aggravated assault under Docket No. 11835-2013 should have merged with his sentence for attempted murder. For the reasons below, we vacate the judgment of sentence for aggravated assault at Docket No. 11835-2013, and affirm in all other respects.

The facts underlying Echols' convictions, as developed during his non-jury trial, were summarized by the trial court as follows:[4]

> On August 12, 2013, shortly before 9:00 p.m., fifteen-year-old [K.H.] accompanied his step-father Clarence Green, his mother, and his three brothers to [Echols'] home following his brothers' football practice so that [] Green could [] visit [his] daughter, the mother of whom, Mercedes Echols, is [Echols'] wife. Prior thereto, [] Green regularly visited his daughter pursuant to an informal visitation agreement. However, Green had not seen his daughter in some time and wanted to find out why access had been denied.
>
> After [] Green knocked at the door, [Echols] appeared and the men spoke for a short time through the screen door. [Echols] told [] Green to leave after saying he did not want any problems.[2] The men then began arguing in front of [Echols'] residence after [Echols] said it was a bad time and that [Green] should call Mercedes to discuss visitation. Mercedes eventually came to the door and she and [] Green began a discussion about their daughter. As they were talking, [Echols] grabbed a hammer and charged at [] Green, who was unarmed, and struck him in the chest with the claw portion. The two men began fighting and struggling for control of the hammer. [] Green, who

(Footnote Continued) ———————————

[4] We will refer to victim, K.H., and witness, C.M., by their initials because they are both minors.

- 2 -

was struck with the hammer several times, eventually gained control of the hammer and threw it in the yard.

———————

² [] Green denied being told to leave.

———————

After [] Green was struck with the hammer, [K.H.'s] mother exited the car to assist. [K.H.] followed her at which time [Echols] ran back inside the house and retrieved a box cutter and attacked [K.H.]. [K.H.] reflexively punched [Echols] and [Echols] responded by slashing him numerous times in and around his neck with the box cutter. Although [K.H.] believed that [Echols] was punching him, in actuality, [Echols] stabbed [K.H.] with the box cutter causing horrific slash wounds to his head and neck. [] Green tackled [Echols] to get him off [K.H.] after which he took off his shirt and used it to stop the flow of blood from [K.H.'s] neck. [K.H.] was rushed to a hospital where he underwent surgery. Before leaving the scene, [] Green threw a golf ball at [Echols'] house because he was angry about the attack.

[C.M.], [K.H.'s] brother, who stayed inside the car, saw [Echols] and [] Green talking. He then saw [Echols] rush from the house striking [] Green with a hammer and then saw [Echols] attack [K.H.] cutting him with a box cutter.³

———————

³ [C.M.'s] testimony was introduced by stipulation. [C.M. was seven years old at the time of the incident. *See* N.T., 6/5/2014, at 69.]

———————

Philadelphia Police Officer Joseph Porrecca was assigned to investigate the incident. He spoke to each of the persons in the car that drove to [Echols'] house, including [K.H.], who told him that [Echols] stabbed him when he tried to break up the fight between [] Green and [Echols]. In addition, Police Detective Timothy Connell interviewed several of the participants, examined the scene, and took photographs. That examination confirmed that [K.H.] was stabbed outside the residence. Police also executed a search warrant at [Echols'] residence but did not find a box cutter.

In his defense, [Echols] presented the testimony of Mercedes Echols. She testified that [] Green and the others came to her home uninvited to see his daughter. She also stated that she had full custody of their daughter and that she had no contact with [] Green for eight or nine months prior to the incident. She further stated that [K.H.] and his mother came to her door and began arguing with [Echols]. She pushed [Echols] away from the door [and] Green then began tugging at the screen door in an attempt to come inside when he heard his daughter's voice. Green eventually opened the door at which time he and several others rushed inside the residence, after which a fight broke out in the living room. When the fight ended, [] Green and those with him went outside. [Mercedes] grabbed a kitchen knife and followed them outside where she was accused by [K.H.'s] mother of having stabbed [K.H.]. [] Green then began throwing bricks at her house and some windows were broken.

[Mercedes] denied stabbing anyone and stated that she did not see anything in [Echols'] hand. She conceded that police found a hammer on the floor of her living room and that it was likely one of her possessions. She further testified that she called the police because [] Green said he was going to return and that other than the butcher's knife she was holding she saw no weapons and did not know who stabbed [K.H.].

Trial Court Opinion, 11/18/2015, at 2-5 (internal record citations omitted).

Echols was subsequently arrested and charged in two separate informations. For the crimes against Green, Echols was charged at Docket No. 11834-2013 with aggravated assault (two counts), possessing an instrument of crime ("PIC"), simple assault (two counts), and recklessly endangering another person ("REAP").[5] He was also charged at Docket No. 11835-2013, with attempted murder, aggravated assault, PIC, simple

---

[5] **See** 18 Pa.C.S. §§ 2702(a)(1) and (a)(4), 907, 2701(a)(1) and (a)(2), and 2705, respectively.

assault (two counts), and REAP,[6] for the offenses he committed against K.H. The cases were consolidated for a non-jury trial on June 5, 2014.

At the conclusion of the trial, the court found Echols guilty of all the crimes charged at Docket No. 11834-2013 (victim Green), with the exception of one count of aggravated assault. *See* 18 Pa.C.S. § 2702(a)(4). With respect to Docket No. 11835-2013 (victim K.H.), the court found Echols guilty of all charges with the exception of one count of simple assault. *See* 18 Pa.C.S. § 2701(a)(2). On August 29, 2014, the trial court imposed the following sentence: (a) at Docket No. 11834-2013, a term of one to five years' imprisonment for PIC, and two to four years' imprisonment for aggravated assault, and (b) at Docket No. 11835-2013, a term of eight to 20 years' imprisonment for attempted murder, eight to 20 years' imprisonment for aggravated assault, and one to five years' imprisonment for PIC. All of the sentences were imposed to run concurrently so that Echols' aggregate sentence was eight to 20 years' imprisonment.[7]

Echols filed a post-sentence motion challenging the weight and sufficiency of the evidence, and seeking reconsideration of the sentence imposed on the charges of aggravated assault and PIC. On January 26,

---

[6] *See* 18 Pa.C.S. §§ 901, 2502, 2702(a)(1), 907, 2701(a)(1) and (a)(2), and 2705, respectively.

[7] No further penalty was imposed on the remaining offenses.

2015, the trial court entered an order granting Echols' motion for reconsideration of the aggravated assault sentence at Docket No. 11835-2013, and imposed a new concurrent term of six to 12 years' imprisonment.[8] *See* Order, 1/26/2015. In all other respects, the court denied Echols' post-sentence motion. This timely appeal followed.[9]

In his first issue, Echols challenges the sufficiency of the evidence supporting his convictions. Specifically, he argues the evidence was insufficient to disprove his claim that his actions were justified under the "castle doctrine." *See* Echols' Brief at 14-17.

Our review of a sufficiency of the evidence challenge is well-settled:

> The standard we apply … is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need

---

[8] Echols sought reconsideration of the sentence because he claimed the court applied an incorrect prior record score to that charge. *See* Post-Sentence Motion, 1/26/2015, at 2-3.

[9] On April 14, 2015, the trial court ordered Echols to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Echols did not comply with the court's directive during the requisite 21-day filing period, but rather, filed a concise statement on May 28, 2015. Counsel's failure to comply with the court's order constitutes ineffectiveness *per se*. *See Commonwealth v. Thompson*, 39 A.3d 335, 340 (Pa. Super. 2012). Nevertheless, since the trial court accepted the untimely concise statement and addressed the issues raised therein in its opinion, "we need not remand and may address the merits of the issues presented." *Id.*

not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Truong*, 36 A.3d 592, 597 (Pa. Super. 2012) (*en banc*) (quotation omitted), *appeal denied*, 57 A.3d 70 (Pa. 2012).

Where, as here, a defendant claims his actions were justified by self-defense, he has no burden to prove that claim. **See Commonwealth v. Smith**, 97 A.3d 782, 787 (Pa. Super. 2014). Rather, once there is any evidence before the factfinder which supports a claim of self-defense, the Commonwealth bears the burden of disproving the claim beyond a reasonable doubt. **See id.**

The defense, found in Section 505 of the Crimes Code provides, in relevant part:

> **(a) Use of force justifiable for protection of the person.--** The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> **(b) Limitations on justifying necessity for use of force.--**
>
> * * * *
>
> (2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily

injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

> (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S. § 505(a), (b)(2). Accordingly, the Commonwealth may disprove a claim of self-defense if it establishes:

> 1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety.

*Smith*, *supra*, 97 A.3d at 787 (quotation omitted). Further, "the Commonwealth can negate a self-defense claim by proving the defendant 'used more force than reasonably necessary to protect against death or serious bodily injury.'" *Id.* at 788, *quoting* *Truong*, *supra*, 36 A.3d at 599.

"[T]he castle doctrine is a specialized component of self-defense, which recognizes that a person has no duty to retreat from his or her home before using deadly force as a means of self-defense." *Commonwealth v. Childs*, 142 A.3d 823, 825 n.1 (Pa. 2016). The doctrine is codified in subsection (b)(2.1) of the self-defense statute:

> (2.1) [A]n actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or

sexual intercourse compelled by force or threat if both of the following conditions exist:

(i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.

(ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

18 Pa.C.S. § 505(b)(2.1)(i)-(ii).  Therefore, when a defendant uses deadly force to protect himself from another who has "unlawfully and forcefully entered" his home, the factfinder may **presume** the defendant had a "reasonable belief" that the use of deadly force was necessary.[10]  *Id.* at § 505(b)(2.1)(i).  However, as our Supreme Court observed, the Commonwealth may "overcome a claim of self-defense under the castle doctrine by establishing that the defendant did not actually possess the requisite fear or that the defendant's belief was not reasonable." *Childs*, *supra*, 142 A.3d at 831.

Here, Echols argues the evidence demonstrated he was "justified in using force to protect his family, as Green remained on [his] property and

---

[10] In *Childs*, *supra*, the Pennsylvania Supreme Court explained that the enactment of Section 505(b)(2.1) in 2011 did not broaden the "castle doctrine." *See Childs*, *supra*, 142 A.3d at 831. Rather, it provided an "evidentiary mechanism to aid in the factfinder's evaluation of the merits of a castle doctrine defense." *Id.* at 832.

fought [him] on the threshold of his home." Echols' Brief at 14. Echols claims he "only used force when Green remained on his stoop asking to speak with Mercedes." *Id.* at 16. Further, he maintains, "[g]iven the late hour and the fact [Echols] had five young children in his home, Green's insistence that he speak to Mercedes brought the instant matter squarely within Pennsylvania's Castle Doctrine." *Id.* at 16-17.

The trial court disagreed, concluding:

> [W]hen viewed in the proper light, there was ample evidence to disprove [Echols'] claim that he was acting in self-defense when he attacked [] Green with a hammer and stabbed [K.H.] in the neck. Both victims credibly testified that they were unarmed and other than going to [Echols'] residence, neither took any action to provoke [Echols] or make him believe that the use of deadly force was necessary. In fact, [K.H.] took no action justifying [Echols'] use of deadly force. The Commonwealth's witnesses testified that [Echols] was the only person they saw with weapons and that everyone else was unarmed. Thus, it is clear that the Commonwealth met its burden of disproving [Echols'] claim of justification.

Trial Court Opinion, 11/18/2015, at 6. Moreover, with regard to Echols' "castle doctrine" claim, the court found Echols "was not in legitimate fear" of death or serious bodily injury, as to justify the use of deadly force to protect himself and his family. *Id.* at 7. The court characterized the incident as "a verbal altercation and some 'tussling' between two adults[,]" which Echols then escalated by arming himself and attacking Green with a hammer. *Id.* Further, the court emphasized that "after it appeared the incident was over, [Echols] charged out of his house, grabbed [K.H.], a fifteen year-old boy,

and slashed him numerous times in the head and neck with a box cutter." *Id.* at 7-8.

Our review of the trial transcript provides ample support for the court's findings. Indeed, the only testimony that Green and K.H. entered Echols' home was from Echols' wife, Mercedes,[11] and the trial court characterized that testimony as "self-serving." Trial Court Opinion, 11/18/2015, at 6. Both Green and K.H. testified the attack occurred outside Echols' home.[12] *See* N.T., 6/5/2014, at 14-16, 43-45. Moreover, the parties stipulated that K.H.'s younger brother, C.H., who watched the incident from Green's car, would have testified that Echols attacked Green and K.H. outside the home. *See id.* at 68. Moreover, there was no testimony from any of the witnesses that either Green or K.H. was armed with a weapon, or even threatened to use a weapon. Therefore, the trial court could reasonably infer Echols was responsible for escalating the situation.

The trial court, who sat as factfinder, determined that Echols did not possess a "reasonable belief that deadly force [was] immediately necessary to protect himself" or his family. 18 Pa.C.S. § 505(b)(2.1). Further, while Echols did not have a duty to retreat from the situation occurring directly

_____

[11] *See* N.T., 6/5/2014, at 95-97.

[12] We note K.H. acknowledged under cross-examination that in his statement to police, he claimed he went inside the house "about a foot" before going back outside. *Id.* at 26-27. K.H. insisted, however, that he was stabbed outside the house. *Id.* at 37.

- 11 -

outside his home, the evidence presented by the Commonwealth established that Echols "continued" and escalated the situation by introducing weapons to a verbal altercation, which is not justified under the defense. **Smith**, **supra**, 97 A.3d at 787. Accordingly, Echols' sufficiency claim fails.

Next, Echols argues the verdict was against the weight of the evidence. He claims the testimony of both the Commonwealth and defense witnesses "overwhelmingly supported [Echols'] acts of self-defense." Echols' Brief at 18. In particular, Echols argues the court "misapplied" the law relating to the "castle doctrine" by "assuming force can only be met with force" and failing to recognize the physical evidence supported his assertion that the fight occurred inside his home. Echols points to the fact that the police observed a dustpan with dirt in it inside the home, and blood on the front door. **Id.** at 18. He explains the dustpan corroborated Mercedes' testimony that she had to clean up a potted plant, which was overturned during the fight. **Id.** at 19. Further, he asserts that because the front door opened inward, and the testimony confirmed it was open during the affray, "in order for blood to get on the door, the fight necessarily occurred inside." **Id.**

Preliminarily, however, we must address the Commonwealth's claim that this issue is waived for our review. **See** Commonwealth's Brief at 13-14. It is axiomatic that a challenge to the weight of the evidence must be preserved in the trial court either orally or on a written motion before sentencing, or in a post-sentence motion. **See** Pa.R.Crim.P. 607(A)(1)-(3).

"Failure to properly preserve the claim will result in waiver, even if the trial court addresses the issue in its opinion." ***Commonwealth v. Lofton***, 57 A.3d 1270, 1273 (Pa. Super. 2012), *appeal denied*, 69 A.3d 601 (Pa. 2013). Moreover, "[a]n untimely post-sentence motion does not preserve issues for appeal." ***Commonwealth v. Wrecks***, 931 A.2d 717, 719 (Pa. Super. 2007).

Here, the Commonwealth contends Echols failed to raise his weight claim either before sentencing or in a post-sentence motion. ***See*** Commonwealth's Brief at 14. The record reveals, however, that on September 19, 2014, the trial court issued an order, scheduling a hearing for October 10, 2014, to consider Echols' "attached Combined Motion to Reconsider [] Sentence and Pos[t]-Sentencing Motion for Extraordinary Relief." ***See*** Order, 9/19/2016. While there is no motion attached to the order, nor any motion docketed prior to its entry, the show cause order was prepared by Echols' trial counsel, and, presumably, attached to a post-sentence motion. Echols subsequently retained new appellate counsel, who filed a similar motion on January 26, 2015. That same day, the trial court entered an order, granting Echols' motion for reconsideration of sentence in part, and denying his post-sentence motion. At no time did the trial court indicate Echols' weight of the evidence claim was not properly preserved. Accordingly, we decline to find it waived on appeal.

Our review of a weight claim is well-established:

The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock one's conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence. An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice.

*Commonwealth v. Rosser*, 135 A.3d 1077, 1090 (Pa. Super. 2016) (*en banc*), *quoting* *Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015), *appeal denied*, 125 A.3d 1196 (Pa. 2015) (citations omitted).

The trial court addressed Echols' weight of the evidence challenge as follows:

Applying the above standard to the instant matter, this Court correctly concluded that the verdict does not shock the conscience. The evidence, including that presented by [Echols], did not support his claim that he was justified in using deadly force. As noted above, [Echols] introduced a weapon into what was a minor dispute. He then introduced a second weapon after the first incident had ended. The testimony presented by [Mercedes, Echols'] wife was refuted by the Commonwealth's evidence. Moreover, it was not supported by the physical evidence. Her claim that the fight occurred inside the residence is belied by the Commonwealth's evidence and her testimony that [Echols] did not possess a hammer was not credible because police recovered a hammer on the floor of [Echols'] living room. Clearly, someone possessed the hammer during the incident given that hammers are not normally found lying on the floor of living rooms of homes occupied by small children.

- 14 -

Trial Court Opinion, 11/18/2015, at 9.

We find Echols has failed to establish the trial court abused its discretion in determining the verdict was not against the weight of the evidence. **See Rossner**, **supra**. We remind Echols that credibility determinations are within the sole province of the factfinder. **See id.** Here, the Commonwealth's witnesses testified the assault occurred outside Echols' home, and the physical evidence Echols refers to did not conclusively prove otherwise. We emphasize that, in the present case, the trial court also sat as factfinder. The fact the court did not find Echols' version of the assault credible does not establish it abused its discretion. Accordingly, no relief is warranted on this claim.

Lastly, Echols asserts his sentence on the charge of aggravated assault at Docket No. 11835-2013 is illegal because it should have merged with his sentence for attempted murder at that docket. **See** Echols' Brief at 21-22. We agree.[13]

---

[13] We note that while this issue was not included in Echols' concise statement, or otherwise raised in the trial court, a claim that a conviction should have merged for sentencing purposes "is a question implicating the legality of [a] sentence" and, accordingly, cannot be waived. **Commonwealth v. Baldwin**, 985 A.2d 830, 833 (Pa. 2009). **See also Commonwealth v. Dixon**, 997 A.2d 368, 380 n.19 (2010) (*en banc*), *appeal denied*, 26 A.3d 482 (Pa. 2011). "Consequently, our standard of review is *de novo* and the scope of our review is plenary." **Baldwin**, **supra**, 985 A.2d at 833.

Section 9765 of the Sentencing Code governs the merger of sentences, and provides:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765. Therefore, sentences for separate offenses merge "only when two distinct criteria are satisfied: (1) the crimes arise from a single criminal act; and (2) all of the statutory elements of one of the offenses are included within the statutory elements of the other." *Commonwealth v. Kimmel*, 125 A.3d 1272, 1276 (Pa. Super. 2015) (*en banc*), *appeal denied*, 136 A.3d 980 (Pa. 2016).

In *Commonwealth v. Anderson*, 650 A.2d 20 (Pa. 1994), the Pennsylvania Supreme Court found that, for merger purposes, all of the statutory elements for the crime of aggravated assault are included within the statutory elements for the crime of attempted murder.

> It is clear that the offense of aggravated assault is necessarily included within the offense of attempted murder; every element of aggravated assault is subsumed in the elements of attempted murder. The act necessary to establish the offense of attempted murder - a substantial step towards an intentional killing - includes, indeed, coincides with, the same act which was necessary to establish the offense of aggravated assault, namely, the infliction of serious bodily injury. Likewise, the intent necessary to establish the offense of attempted murder - specific intent to kill - is greater than and necessarily includes the intentional, knowing, or reckless infliction of serious bodily injury, the intent required for aggravated assault. It is

> tautologous that one cannot kill without inflicting serious bodily injury. 18 Pa.C.S. § 2301.

*Id*. at 24. **Anderson**, however, predated the enactment of Section 9762; therefore, the Court did not undertake the second part of the merger analysis, namely, whether the crimes arose from a single criminal act.

Here, both the aggravated assault charge and the attempted murder charge at Docket No. 11835-2013 arose from Echols' stabbing of K.H. in the neck with a box cutter. The Commonwealth argues, however, that the convictions did not "stem from one criminal act." Commonwealth's Brief at 17. Rather, relying on **Commonwealth v. Wesley**, 860 A.2d 585 (Pa. Super. 2004), *appeal dismissed as improvidently granted*, 896 A.2d 564 (Pa. 2006), it asserts Echols' "five to six strikes" with the box cutter to K.H.'s neck "exceeded the requirements of any single crime, and justified the imposition of sentences for both attempted murder and aggravated assault." Commonwealth's Brief at 17.

In **Wesley**, *supra*, a panel of this Court rejected the defendant's claim that the consecutive sentences imposed on his convictions of aggravated assault and attempted murder should have merged for sentencing purposes. While the charges arose from one incident, the panel found the defendant's actions "constituted two separate criminal acts." **Wesley**, *supra*, 860 A.2d at 593. Specifically, the panel concluded the defendant first committed aggravated assault when he shot the victim in the back as the victim turned to pick up his young son. *Id.* Then, moments later when the victim pushed his son out of harm's way and grabbed the gun, the defendant committed

attempted murder when he shot the victim five more times. *Id.* The panel opined: "This **second series of gunshots** clearly demonstrated a substantial step by Appellant toward the intentional killing of the victim, and thus constituted attempted murder." *Id.* (emphasis supplied). The panel relied on the following language of the Pennsylvania Supreme Court in *Commonwealth v. Belsar*, 676 A.2d 632 (Pa. 1996): "If ... the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime, then the actor will be guilty of multiple crimes which do not merge for sentencing purposes." *Id.* at 634 (quotation omitted). *See id.* (finding defendant committed separate criminal acts for sentencing purposes; attempted murder charge was supported by shooting of victim, and aggravated assault charge was supported by kicking injured victim as defendant attempted to steal his car).

In the present case, we cannot conclude that Echols' actions in repeatedly stabbing K.H. five or six times constituted more than one criminal act to support separate sentences for the charges of aggravated assault and attempted murder. Indeed, the Commonwealth contends the infliction of the first wound supported the charge of aggravated assault, and the repeated (instantaneous) slashings supported the charge of attempted murder. *See* Commonwealth's Brief at 17. However, the facts presented herein differ from those in *Wesley* and *Belsar*. In both of those cases, the separate sentences were based upon separate acts. While we recognize the merger analysis "does not turn on whether there was a 'break in the chain'

of criminal activity,"[14] both of the cases upon which the Commonwealth relies involved the commission of **separate** criminal acts. **See Belsar**, **supra** (shooting victim, and later kicking injured victim); **Wesley**, **supra** (shooting victim in back, and when he turns to grab gun, shooting victim five more times). Conversely, in the present case, K.H. testified that Echols "grabbed" him on the shoulder and then began "punching" him. N.T., 6/5/2014, at 16-17. However, he soon realized that rather than "punching" him, Echols was slashing him with a box cutter. **Id.** at 17-18. Both the aggravated assault charge and the attempted murder charge were based upon these slashings.[15] Therefore, since both convictions were predicated upon a single act, *i.e.* five or six slashings, we conclude the trial court erred in imposing separate sentences.

Accordingly, we vacate the illegal sentence imposed on the aggravated assault charge at Docket No. 11835-2013. Because that sentence ran concurrently to the remaining sentences, we need not remand for resentencing, as our correction of the illegal sentence does not disrupt the court's sentencing scheme. **See Commonwealth v. Melvin**, 103 A.3d 1, 56 (Pa. Super. 2014).

---

[14] **Commonwealth v. Robinson**, 931 A.2d 15, 24 (Pa. Super. 2007) (en banc) (quotation omitted).

[15] Indeed, there is no indication in the testimony that when Echols initially "grabbed" K.H., he slashed him, so that the subsequent slashing might have constituted a separate criminal act. N.T., 6/5/2014, at 16-17.

Judgment of sentence vacated in part, and affirmed in part. Jursidiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/17/2017