**COMMONWEALTH of Pennsylvania**

v.

**Son TRUONG, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 12, 2011.

Filed Jan. 13, 2012.

Mark Cichowicz, Public Defender, Philadelphia, for appellant.

Kristen A. McDonald, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., FORD ELLIOTT, P.J.E., MUSMANNO, BENDER, GANTMAN, PANELLA, ALLEN, LAZARUS, and MUNDY, JJ.

OPINION BY FORD ELLIOTT, P.J.E.:

Son Truong appeals from the June 9, 2009 judgment of sentence entered in the Court of Common Pleas of Philadelphia County, following his conviction for third-degree murder and possession of an instrument of crime ("PIC").[1] For the following reasons, we affirm.[2]

At some point during the late evening hours of December 10, 2007 and going into the early morning hours of December 11th, appellant stabbed his father, Lok Truong, to death in the home he shared with his parents in Philadelphia. Appellant was arrested and charged with murder and PIC. A preliminary hearing was held wherein appellant's mother, Co Vo, testified that for approximately three days prior to his death, the victim had been drinking large quantities of alcohol and not eating. (Notes of testimony, 3/4/08 at 21.) On December 10, 2007, he was again drinking and was acting mean, threatening to cut Co Vo's throat and stab appellant's eyes out. (*Id.* at 22–23.) Because of the victim's conduct, she went to bed at 7:00 p.m. and locked the bedroom door so the victim could not enter. (*Id.* at 23–24.) Co Vo stated that appellant had also retreated to his bedroom during the day and remained there into the night. (*Id.* at 23.)

Co Vo went on to explain that she arose in the night to use the bathroom and discovered that her husband was dead. (*Id.* at 10–12.) Prior to going to the bathroom, she heard a noise and opened the door to see her son and the victim wrestling in appellant's bedroom. (*Id.* at 24, 26.) In a signed statement she gave to the police following the incident, Co Vo stated that when appellant and the victim were wres-

---

1. On February 17, 2011, a prior three-judge merits panel majority found that the trial court erred in concluding the Commonwealth met its burden of disproving appellant's claim of imperfect self-defense, therefore, insufficient evidence of malice to sustain third-degree murder was presented. The panel majority reversed in part, remanding for resentencing on the possession of instruments of crime conviction. *Commonwealth v. Truong*, No. 1787 EDA 2009, unpublished memorandum (Pa.Super. filed February 17, 2011) (Freedberg, J. concurring and dissent-

ing). By *per curiam* order, on April 21, 2011, this court granted the Commonwealth's application for reargument, withdrew its panel decision, and directed the case to be listed before an *en banc* panel. Both parties have filed substituted briefs.

2. This court may affirm for any reason, including such reasons not considered by the lower court. *Commonwealth v. Price*, 876 A.2d 988, 993 (Pa.Super.2005).

tling, she saw "a knife drop down but [she] [didn't] know who was holding it." (*Id.* at 17.) She stated that the victim was bleeding from the head, and she told him and appellant to stop. (*Id.* at 16.) When the men did stop, Co Vo saw a copious amount of blood coming from the victim. (*Id.*) Co Vo explained that appellant wanted to call the police, but she wanted to wait to notify family first. (*Id.* at 29.) Consequently, the victim had been dead for several hours before the police were notified. (*Id.* at 27.)

Based on Co Vo's testimony and other evidence presented by the Commonwealth, appellant's case proceeded to trial. During its case-in-chief, the Commonwealth admitted Co Vo's preliminary hearing testimony. Additionally, the Commonwealth proffered the testimony of appellant's brother, Anh Truong. Anh testified that on December 11, 2007, he received a telephone call from appellant at approximately 6:30 a.m. informing him that their father had died. (Notes of testimony, 4/6/09 at 59, 61.) In response, Anh traveled to his parents' home to find the police had arrived; appellant was in handcuffs. (*Id.* at 63–64.) Anh stated that his mother, who was crying, told him that for the past four or five days, the victim had been drinking and not eating. (*Id.* at 75.) In fact, the last time Anh saw his father, his father had been drinking. Anh explained that when the victim drank, he often became surly and threatened Co Vo. (*Id.* at 72.) Anh testified that on prior occasions, he heard the intoxicated victim tell Co Vo that he would cut her head off while wielding a knife. (*Id.* at 67–68.)

Officer Najihma Morris and his partner responded to the scene after receiving a domestic disturbance call. Upon arrival, he knocked on the door for approximately two to three minutes before appellant opened it. (*Id.* at 112–113.) When the officers asked appellant if everything was alright, appellant told the officers that everything was fine and denied calling the police. (*Id.* at 114.) However, the officer observed that appellant's shirt was bloody and stretched out of shape; appellant also had tissue wrapped around two of the fingers on his right hand. (*Id.*) Officer Morris testified that he heard a woman crying and screaming. (*Id.*) Thus, the officers asked appellant if they could come inside, and appellant permitted them to enter the residence. (*Id.* at 115.)

Officer Morris proceeded to the second floor where the woman was located. (*Id.* at 116.) He observed that Co Vo had blood on her hands and was standing close to a bucket with bloody paper towels inside of it. (*Id.* at 117.) Officer Morris also saw the victim lying on the floor of a bedroom with a blanket covering his body; the victim did not appear to be breathing. (*Id.* at 118, 120.) After determining that he was deceased, Officer Morris went back downstairs and spoke with appellant who stated, "I did it, we had a fight, I called my brother." (*Id.* at 123–124, 127.) Appellant revealed a knife that was hidden under the couch in the living room, and told the officers that there were two other knives in the bathroom on the second floor. (*Id.* at 128, 138, 140.) Those knives were subsequently discovered in a hamper in the bathroom.

Gary Collins, M.D., who worked for the Medical Examiner's Office, testified as an expert in the field of forensic pathology in the Commonwealth's case-in-chief. Dr. Collins performed the autopsy on the victim. Dr. Collins stated that the victim suffered multiple stab wounds to his chest, abdomen, and back.[3] (*Id.* at 81, 84, 86, 92.)

---

**3.** The trial court concluded that there were at least 11 stab wounds inflicted to the body.

(Trial court opinion, 11/18/09 at 3 n. 1).

The victim also suffered several blunt force injuries to the head. (*Id.* at 95.) The doctor could not state with scientific certainty in which order the wounds had been inflicted. (*Id.* at 98.)

In regards to how the injuries may have affected the victim physically, the Commonwealth and Dr. Collins had the following exchange:

[The Commonwealth]: ... I have a question as to, specifically, the wounds that caused a great deal of blood loss. What effect, if any, would they have on a person's ability to stay upright and their physical strength after receiving those wounds?

[Dr. Collins]: Let me just see, you are asking what would be the effect of significant blood loss?

[The Commonwealth]: Yes.

[Dr. Collins]: Well, if someone loses a lot of blood fairly rapidly, they begin to get weak and lose their consciousness or not be as alert as they should be, they're going to become faint and then collapse, and then they're not necessarily going to be able to respond clearly to any questions, they're not probably going to be able to put up a fight, and then with the sufficient blood loss, they're going to lose total consciousness and then eventually die because of the blood loss.

[The Commonwealth]: Where you've described as not being able to stand upright, how long of a period of blood loss would it take for that to happen?

[Dr. Collins]: It depends, but someone goes into shock if they lose approximately a third of their blood volume, and if it's rapid and there are other mitigating factors, it could take anywhere from 30 seconds to three minutes, difficult to say.

[The Commonwealth]: And aside from blood loss, were there any other injuries, any other of the injuries that you described in this report that had an effect on [the decedent's] motor functions?

[Dr. Collins]: Certainly; the injuries to his forehead, for instance, depending on how severe that injury was and the time that was sustained, it may have rendered him either unconscious or somewhat confused, again, depends on the severity of force.

*Id.* at 98–100. Dr. Collins opined that, in order to cause the lacerations to the victim's head, he would have had to have been hit with a "fair degree of force" but also acknowledged that, in terms of "how severe and its effect on the actual individual," he could not determine with certainty. (*Id.* at 100, 106–107.) Lastly, Dr. Collins performed a toxicology test on the victim which revealed that he had a blood alcohol content of .260 at the time of death, an amount over three times the legal limit. The doctor could not draw any conclusions as to how that blood alcohol content would have affected the victim's physical capabilities. (*Id.* at 109.)

The defense presented Richard Truong, another brother of appellant. Richard explained that the victim was a nice man but a "totally different person" when he was drinking. (Notes of testimony, 4/27/09 at 40.) Richard stated that he was "unpredictable and aggressive" when under the influence of alcohol. (*Id.* at 41.) When the victim would drink, he would threaten to kill Richard and would go into the kitchen and grab knives. (*Id.* at 44–45.) Richard also heard the victim threaten his mother and appellant in the same manner. (*Id.* at 46.) He explained that in the six-month period preceding his death, the victim had been drinking heavily, consuming alcohol nearly every day. Moreover, in the days immediately preceding his death, the victim had been acting strangely. (*Id.* at 49.) For instance, Richard testified that approximately three or four days before his

death, the victim had come to his home at 8:00 p.m. and wanted to paint his house. (*Id.*) When Richard attempted to prevent him from doing so, the victim stated, "I'm going to kill you all and I'm going to kill myself too." (*Id.* at 51.)

Richard also described the victim as a small man, standing approximately 5'3" and weighing about 125 to 130 pounds, while appellant stood approximately 5'9" and weighed about 145–150 pounds. (*Id.* at 58.) However, Richard testified that when the victim drank, he had a lot of physical strength and was stronger than appellant. (*Id.* at 59.)

The defense also presented the testimony of Tony Pham, M.D., as an expert in the field of psychiatry. (*Id.* at 84.) Dr. Pham had examined appellant prior to trial and opined that he suffered from severe mental illness; specifically, schizophrenia and depression. (*Id.* at 85.) Dr. Pham stated that after speaking with appellant, reviewing police reports, and reading preliminary hearing testimony of appellant's mother, he reached the following conclusion regarding appellant's state of mind on the night he killed his father:

> [Dr. Pham]: [M]y professional opinion is that he felt that [the victim] was going to endanger the family and he felt very strongly that it was an imminent threat, he had the belief that [the victim] was like Saddam Hussein, a dictator, and he expressed very clearly and I think there was no reason for me to doubt him that he believed [the victim] was going to endanger the family.
>
> . . . .
>
> [I]t is reasonable to believe that [appellant] was very frightened [when wrestling with the victim] and he would likely have felt that his life was in danger. He also felt that his family's life [sic] might have been in danger as well. . . .

*Id.* at 89–90. The doctor opined that the number of stab wounds was consistent with a psychotic thought process. (*Id.* at 76–92.)

Lastly, the defense presented evidence that the decedent had been involved in a prior physical altercation with Nghia Truong, another of appellant's brothers. The Commonwealth and defense stipulated that the victim had been arrested in March of 2005 for cutting Nghia on his head with a knife, but those charges were later withdrawn.[4] (*Id.* at 133.) Additionally, it was stipulated that appellant had been hospitalized in a psychiatric unit from December 30, 2000 to January 19, 2001, and at a prior date from July 23, 1997 to August 3, 1997. (*Id.* at 132.)

Following a bench trial, appellant was convicted of third-degree murder and PIC. On June 9, 2009, appellant was sentenced to a term of imprisonment of 6½ to 15 years for third-degree murder; no penalty was imposed for the remaining count. Post-sentence motions were not filed. This timely appeal was taken on June 17, 2009. The trial court directed appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A. Appellant filed the statement and the trial court has filed an opinion.[5] Herein, he presents two issues for our review:

(1) Was not the evidence insufficient to prove beyond a reasonable doubt that [appellant] was guilty of murder in the third degree in that the

---

4. The trial court incorrectly states that appellant had allegedly stabbed Nghia. (*See* trial court opinion, 11/18/09 at 5.)

5. Appellant filed his Rule 1925(b) statement late and requested that it be accepted *nunc pro tunc*. The trial court filed an order granting acceptance.

evidence was insufficient to prove beyond a reasonable doubt that [appellant] was *not* acting under an unreasonable belief that the circumstances were such that, if they existed, would have justified the killing inasmuch as the lower court's decision to the contrary was based upon a factual determination that was not supported by the evidence (to wit, that the decedent was incapacitated by an initial blow to the head and was, therefore, not a continuing threat)?

(2) Was the evidence insufficient to prove beyond a reasonable doubt that [appellant] was guilty of murder in the third degree in that the evidence was insufficient to prove beyond a reasonable doubt that the defendant was *not* acting under a sudden and intense passion resulting from serious provocation by the decedent inasmuch as the lower court's decision to the contrary was based upon a factual determination that was not supported by the evidence (to wit, that [appellant's] actions were motivated by longstanding hatred of his father)?

Appellant's substituted brief at 3 (emphasis in original).

Appellant argues that the Commonwealth failed to provide sufficient evidence that he acted with malice in killing the victim. In its Rule 1925(a) opinion, the trial court explained that it found appellant guilty of murder in the third degree as "appellant acted with malice, anger and hatred when he killed his father." (Trial court opinion, 11/18/09 at 8.) We find the record supports the trial court's conclusion, again, for reasons not considered by the trial court.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Bruce,* 207 Pa.Super. 4, 916 A.2d 657, 661 (2007), *appeal denied,* 593 Pa. 754, 932 A.2d 74 (2007) (citations omitted).

 "Third degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." *Commonwealth v. Tielsch,* 934 A.2d 81, 94 (Pa.Super.2007), *appeal denied,* 597 Pa. 731, 952 A.2d 677 (2008), and *cert. denied,* 555 U.S. 1072, 129 S.Ct. 726, 172 L.Ed.2d 731 (2008) (citation omitted). "Malice is not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of conse-

quences, and a mind regardless of social duty." *Commonwealth v. Hardy*, 918 A.2d 766, 774 (Pa.Super.2007), *appeal denied*, 596 Pa. 703, 940 A.2d 362 (2008). "Malice may be inferred from the use of a deadly weapon on a vital part of the victim's body." *Commonwealth v. Gooding*, 818 A.2d 546, 550 (Pa.Super.2003), *appeal denied*, 575 Pa. 691, 835 A.2d 709 (2003). Further, malice may be inferred after considering the totality of the circumstances. *Commonwealth v. Gonzalez*, 858 A.2d 1219, 1223 (Pa.Super.2004), *appeal denied*, 582 Pa. 695, 871 A.2d 189 (2005).

There is no doubt in this matter that the Commonwealth proved appellant killed the victim with malice. Appellant admitted to the police that he killed his father. The Commonwealth's medical expert testified that the victim had been hit on the head with an unknown object, which would have rendered him either unconscious or somewhat confused. (Notes of testimony, 4/6/09 at 98–100.) The victim was also stabbed 19 times in the torso; some of the wounds were so severe that portions of the victim's internal organs protruded from the wound.

Furthermore, the totality of the circumstances establishes malice. The Commonwealth established a history of animosity between the victim and his family. The victim had a history of drinking and, when drunk, acting in a threatening manner. The Commonwealth stipulated that on one prior occasion, charges were filed after the victim had cut one of his sons with a knife.

Appellant's brothers testified that their usual approach when the victim was acting in a threatening manner was to leave the house and take their mother with them until the victim calmed down. Appellant's brother Richard testified that he last saw the victim several hours prior to his death and stated that the victim was very drunk, but not acting in a manner that led him to believe it was necessary to take his mother away from the residence. There were no witnesses to the violence between appellant and the victim.[6] Co Vo testified that the victim threatened her earlier in the evening, but that she went to bed and locked the door, raising the inference that appellant had adequate time to cool off from any provocation.

 On appeal, he now claims that imperfect self-defense negates the element of malice herein. Appellant's brief provides no record citation in support of his imperfect self-defense argument, in violation of Pa.R.A.P., Rule 2119(c), 42 Pa.C.S.A. Our review of the record reveals that he did not argue imperfect self-defense at trial. Rather, appellant argued that he acted in legitimate self-defense at the onset of the incident, which then escalated into a heat of passion killing. (Notes of testimony, 4/27/09 at 139–140.) At no point did counsel argue that the evidence supported an "imperfect self-defense" claim. New legal theories cannot be raised on appeal. *Commonwealth v. Hanford*, 937 A.2d 1094, 1099 n. 3 (Pa.Super.2007), *appeal denied*, 598 Pa. 763, 956 A.2d 432 (2008); Pa.

---

**6.** The victim's wife's testimony from the preliminary hearing was entered into evidence at trial. Her testimony at the preliminary hearing contradicted her earlier police statement. In her earlier statement to the police, she averred that the victim had verbally threatened her that day and that she had followed her usual practice of locking herself in the bedroom to get away from him. She stated that at some point she woke up and saw appellant and the victim "wrestling" and that a knife was involved, but she could not see who held the knife. At the preliminary hearing, she testified that she had not been threatened that day and that she had not witnessed the incident; when she woke up, her husband was already dead. The trial court found that she was not a credible witness, noting that she was trying to protect both her late husband's reputation and her son.

R.A.P., Rule 302(a), 42 Pa.C.S.A. Thus, this claim is waived.

■■■ Even if it were preserved, we find this claim to be meritless. A defense of "imperfect self-defense" exists where the defendant actually, but unreasonably, believed that deadly force was necessary. 18 Pa.C.S.A. § 2503(b); *Commonwealth v. Marks*, 704 A.2d 1095, 1100 (Pa.Super.1997), *appeal denied*, 555 Pa. 687, 722 A.2d 1056 (1998). However, all other principles of self-defense must still be met in order to establish this defense. *Commonwealth v. Broaster*, 863 A.2d 588, 596 (Pa.Super.2004). The requirements of self-defense are statutory: "The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). If "the defender did not reasonably believe deadly force was necessary[,] he provoked the incident, or he could retreat with safety, then his use of deadly force in self-defense was not justifiable." *Commonwealth v. Fowlin*, 551 Pa. 414, 421, 710 A.2d 1130, 1134 (1998). A successful claim of imperfect self-defense reduces murder to voluntary manslaughter. *Commonwealth v. Tilley*, 528 Pa. 125, 141–142, 595 A.2d 575, 582 (1991).

Instantly, the evidence would not have supported a conviction under Section 2503(b) and no error was committed in this regard. The trial court found that "appellant hit the decedent over the head with a wine bottle. The blow caused the decedent to stagger. At this point, the decedent did not pose a threat. Appellant then retrieved a knife and stabbed the decedent repeatedly and violently." (Trial court opinion, 11/18/09 at 7–8.) However, after a thorough review of the record, we found no evidence supporting the trial court's con-clusion that, prior to stabbing the victim, appellant hit him in the head with a wine bottle. The list of items taken into evidence does not include a wine bottle, and no such bottle appears in the photographs taken of the crime scene. In fact, the only mention of a wine bottle came during Dr. Collins' testimony where he merely stated, at the prompting of the Commonwealth, that a wine bottle could have been the object used. However, the doctor named several other ways in which the injuries could have been inflicted. Furthermore, the doctor could not definitively state how the decedent's injuries physically affected him, and therefore, there is no support in the record for the court's conclusion that the victim staggered after being hit in the head. Also, the expert testified that he could not tell the order in which the injuries were inflicted.

■■■ Nevertheless, aside from this inaccurate factual conclusion, we find sufficient evidence was presented that appellant used more force than necessary to defend himself. Our review of the record indicates that the Commonwealth negated a self-defense claim by proving appellant used greater force than was reasonably necessary to protect against death or serious bodily injury. *See Commonwealth v. Gillespie*, 290 Pa.Super. 336, 434 A.2d 781, 784 (1981). The evidence in this case is sufficient to support the finding appellant used unreasonable force, rendering the claim of self-defense unavailable. Testimony was presented that appellant was at least seven inches taller than the victim and that appellant had stabbed the victim 19 times all over the front and back of his torso. Again, the wounds were so deep that the victim's intestines protruded from his abdomen. *See Commonwealth v. Washington*, 547 Pa. 563, 572–573, 692 A.2d 1024, 1029 (1997) (based on the number and severity of the wounds, appellant

used more force than reasonably necessary to protect himself from serious bodily injury, and the shooting was not in self-defense).

Additionally, testimony was presented that it would have taken between 30 seconds and 3 minutes after the victim was hit on the head with an unknown blunt object before he was no longer able to stand. The medical examiner explained that injuries to the victim's forehead were consistent with being hit in the head and would have rendered him "either unconscious or somewhat confused, . . . depending on the severity of the force." Police observed no injuries to appellant other than a small cut on his hand. *See Commonwealth v. Smouse,* 406 Pa.Super. 369, 594 A.2d 666, 672 (1991) (evidence that appellant caused extensive injuries suggested that he was the aggressor and was not congruent with self-defense).

Furthermore, when the police arrived hours later, appellant denied that anything was wrong in the house; and after the police entered, they found a bucket of bloody rags that had been used to attempt to clean the scene. Appellant also concealed the murder weapon under the couch in the living room. *See Commonwealth v. Robson,* 461 Pa. 615, 628, 337 A.2d 573, 579 (1975) (attempting to destroy or dispose of evidence indicates a consciousness of guilt). Finally, appellant's long history of animosity towards the victim indicates a motive for murder.

In the alternative, appellant claims that he killed his father in the heat of passion and, thus, cannot be found guilty of third-degree murder.

Section 2503 of the Pennsylvania Crimes Code provides that:

A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by . . . the individual killed . . .

18 Pa.C.S.A. § 2503(a). Voluntary manslaughter is the appropriate verdict when the killing is in the "heat of passion" as a result of provocation by the victim. *See Commonwealth v. Kim,* 888 A.2d 847, 853 (Pa.Super.2005), *appeal denied,* 587 Pa. 721, 899 A.2d 1122 (2006). "The test for [serious] provocation is whether a reasonable person confronted by the same series of events, would become impassioned to the extent that his mind would be incapable of cool reflection." *Id.* (internal quotations, citations, and edits omitted).

Here, the trial court obviously found there was no evidence to support appellant's claim of serious provocation necessary to demonstrate heat of passion. Rather, at most, the evidence demonstrated that the victim had been drinking steadily and behaving in a manner he normally behaved when drinking, making verbal threats against his family. Appellant did not testify at trial. Appellant's brother testified that the victim was making general verbal threats approximately eight hours prior to his death, but that he did not think they were of such a nature that his mother and brother were in danger. Appellant's mother testified at the preliminary hearing that the victim had not threatened anybody, but when confronted with her statement to the police that the victim had threatened her, she equivocated. Again, the trial court found none of the mother's testimony to be credible. As sad as the facts of this case may be, there was simply nothing in the evidence at trial to support appellant's assertion on appeal that he was seriously provoked.

Judgment of sentence affirmed.

GANTMAN, J. concurs in the result.

BENDER, J. files a Dissenting Opinion in which LAZARUS and MUNDY, JJ. join.

DISSENTING OPINION BY BENDER, J.:

I respectfully dissent from the Majority's conclusion that Appellant, Son Truong, waived his claim of imperfect self-defense. Additionally, I believe that the evidence introduced at trial was insufficient to support Appellant's conviction for third-degree murder. Accordingly, I would reverse Appellant's conviction for that offense and remand for resentencing on his conviction of PIC.

The Majority concludes that Appellant waived his imperfect self-defense argument because he "argued that he acted in legitimate self-defense at the onset of the incident, which then escalated into a heat of passion killing." Majority's Opinion at 598. I believe that this is too narrow a reading of the record. Appellant also presented evidence, *i.e.* the testimony of Dr. Pham, that Appellant's schizoaffective disorder led him to unreasonably believe that he needed to continue to defend himself by stabbing his father even after his father was likely disabled. *See* N.T. Trial, at 92–93, 119, 124–27. I would consider the presentation of such evidence adequate to preserve Appellant's imperfect self-defense claim.

Moreover, I believe that the Commonwealth failed to present sufficient evidence to sustain Appellant's conviction for third-degree murder. "When a defendant raises the issue of self-defense, the Commonwealth bears the burden to disprove such a defense beyond a reasonable doubt." *Commonwealth v. Ventura,* 975 A.2d 1128, 1143 (Pa.Super.2009) (citation omitted). Instantly, at the close of Appellant's non-jury trial, the court unequivocally stated that it found, *beyond a reasonable doubt,* that there was not "enough evidence to say confidently one way or another that this was a self-defense case." N.T. Trial, 4/27/09, at 169. This declaration confirms that the Commonwealth failed to meet its burden of disproving Appellant's assertion of self-defense. Nevertheless, the trial court proceeded to convict Appellant of third-degree murder, reasoning that the murder of Appellant's father "was caused ultimately by hatred and malice and someone acting on those feelings." *Id.* at 171. However, this was an impermissible conclusion, as "[a] successful claim of self-defense negates the malice element of third[-]degree murder." *Commonwealth v. Marks,* 704 A.2d 1095, 1099 (Pa.Super.1997).

Accordingly, I would find that the evidence was insufficient to sustain Appellant's conviction of third-degree murder, as the Commonwealth failed to disprove his claim of imperfect self-defense.