J-A29014-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TIA JORDAN-MAJOR | : | |
| | : | |
| Appellant | : | No. 711 EDA 2017 |

Appeal from the Judgment of Sentence January 27, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR0012151-2015

BEFORE:   LAZARUS, J., PLATT*, J., and STRASSBURGER*, J.

MEMORANDUM BY LAZARUS, J.:                **FILED NOVEMBER 21, 2017**

Tia Jordan-Major appeals from the judgment of sentence of six-and-one-half to thirteen years' imprisonment, imposed after a jury found her guilty of third-degree murder.[1]  After careful review, we affirm.

Major killed her boyfriend, Frederick Drake, by fatally stabbing him in the chest with a kitchen knife that she grabbed while the two were arguing. Deputy Medical Examiner Dr. Albert Chu, who performed the autopsy on the victim, testified that Drake had a stab wound to his left upper chest, near the collarbone, which injured the left axillary artery and vein, causing extensive bleeding.  Dr. Chu also testified that the stab wound was five inches deep, and angled slightly downward.  N.T. Trial, 11/15/16, at 71-74, 78-81.

---

[1] 18 Pa.C.S. § 2502(c).

---

*   Retired Senior Judge assigned to the Superior Court.

Police Officer Joseph Shookla, one of the first to respond, also testified. Officer Shookla stated that Major did not have any injuries, and he did not find a knife at the crime scene. *Id*. at 168-71, 196; N.T. Trial 11/16/16, at 85-92.

In her statement to detectives, Major said that she picked Drake up from a bar, Charlies B's, and that after she and Drake were home, they argued over his missing cell phone and keys. She told detectives that, at some point, she went into the basement with her daughter, Danielle Johnson, to avoid a confrontation. She stated that Drake calmed down, but the argument later resumed, and that Drake slapped and choked her and pulled her by the hair into the kitchen. While in the kitchen, Drake allegedly choked her again and when he backed up, Major stated she grabbed a knife from the kitchen counter rack, held it in front of her and told Drake to leave her alone. N.T. Trial, 11/15/16, at 226-30; N.T. Trial, 11/16/16, at 81-86; N.T. Trial, 11/17/16, at 44. In her statement, she said the following to the victim: "Leave. Go sit down. Go be with the bitches you were talking about. [She] just didn't want to be beat. [She had] been in abusive relationships before. [And she] shouldn't have to go through that no more." N.T. Trial, 11/16/16, at 73-74, 81-91, 207. At that point, according to her statement, Drake lunged toward her and walked into the knife. N.T. Trial, 11/15/16, at 168-71, 196; N.T. Trial, 11/16/16, at 85-92.

Major also testified at trial. She offered an additional reason for the argument that night, which she had not given in her statement to detectives.

She testified that she picked Drake up from the bar and when they returned home he wanted to have sex, and that she told him "no" because she was menstruating. She stated that Drake slapped her. N.T. Trial 11/15/16, at 226-30; N.T. Trial, 11/16/16, at 74, 81-86; N.T. Trial, 11/17/16, at 44, 170, 174. She also testified that the stabbing was an accident. N.T. Trial, 11/16/16, at 186.

Major's daughter, Danielle, who witnessed the argument, testified as well. She confirmed Major's account that she and her mother went to the basement at one point to avoid a confrontation, and that at times the argument between Major and Drake became physical. Danielle testified that Drake elbowed her in the face when she tried to get between him and her mom. *Id.* at 44, 189-24; 11/17/16, at 35-70, 88.

Following a five-day trial, the Honorable Barbara A. McDermott presiding, the jury convicted Major of third-degree murder. The court sentenced her to 6½ to 13 years' imprisonment. Major filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) statement. She raises three issues for our review:

1. Is [Major] entitled to an arrest of judgment with regard to her conviction for third-degree murder since the evidence is insufficient to sustain the verdict of guilt as the Commonwealth failed to sustain its burden of proving [her] guilt beyond a reasonable doubt?

2. Is [Major] entitled to a new trial as a result of the trial court's ruling that overruled her objection to Deputy Medical Examiner Dr. Albert Chu's testimony that the death of the victim was not an accident?

3. Is [Major] entitled to a new trial as a result of the trial court's ruling that denied her motion for a mistrial made as a result of the improper argument the prosecutor presented in her summation?

Appellant's Brief, at 4.

First, Major challenges the sufficiency of the evidence

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of the witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Troy*, 832 A.2d 1089, 1092 (Pa. Super. 2003) (citations omitted).

Major argues that the Commonwealth failed to meet its burden of establishing third-degree murder beyond a reasonable doubt. Specifically, Major claims the Commonwealth did not prove malice.

Third-degree murder is an unlawful killing with malice, but without the specific intent to kill. *See* 18 Pa.C.S. § 2502(c). *See also Commonwealth v. Santos*, 876 A.2d 360, 363 (Pa. 2005); *Commonwealth v. DiStefano*,

- 4 -

782 A.2d 574, 582 (Pa. Super. 2001). In *Commonwealth v. Truong*, 36 A.3d 592 (Pa. Super. 2012) (en banc), this Court explained, "Third[-]degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." *Id.* at 597. Malice was defined in *Commonwealth v. Drum*, 58 Pa. 95 (1868), as follows:

> The distinguishing criterion of murder is malice aforethought. But it is not malice in its ordinary understanding alone, a particular ill-will, a spite or a grudge. Malice is a legal term, implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Murder, therefore, at common law embraces cases where no intent to kill existed, but where the state or frame of mind termed malice, in its legal sense, prevailed.

*Id.* at 15. The crime of third-degree murder under the Crimes Code incorporates the common law definition of malice. *Commonwealth v. Hinchcliffe*, 388 A.2d 1068, 1070 (Pa. 1978). "Malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury." *Commonwealth v. Cottam*, 616 A.2d 988, 1004 (Pa. Super. 1992). *See Commonwealth v. Hare*, 404 A.2d 388, 391 (Pa. 1979) (malice may be found where perpetrator consciously disregards unjustified and extremely high risk that his actions

might cause death or serious bodily harm).[2]  Malice may be inferred from the use of a deadly weapon on a vital part of the victim's body, or it may be inferred after considering the totality of the circumstances.  *Truong*, *supra* at 598.

Major's argument that there was "no evidence presented to show that [she] acted with . . . malice" is contradicted by the record.  Appellant's Brief, at 18. The trial court observed that Major "acted recklessly and consciously disregarded an unjustified and extremely high risk by introducing the knife into her argument with Drake[.]"  Trial Court Opinion, 4/25/17, at 6.  We agree with the trial court that the evidence, viewed in the light most favorable to the Commonwealth, is sufficient to support the jury's third-degree murder conviction.  That Major testified as to her relationship with and love for Drake does not negate the fact that her recklessness rose to the level of malice sufficient for a finding of third-degree murder.  It was within the jury's province to infer malice from Major's use of a kitchen knife to Drake's chest; the jury was entitled to find that Major acted with a complete disregard of the high risk that her actions would cause significant bodily injury or death to

_____

[2] One legal scholar has defined the point of demarcation for malicious conduct under Pennsylvania law as "dangerousness" — "the ... act creates such a dangerous situation" that the resultant deaths or serious bodily injuries "are products of malice."  Bruce A. Antkowiak, *The Art of Malice*, 60 Rutgers L. Rev. 435, 471 (2008). As Antkowiak explains, "Malice asks for a solemn, societal judgment about whether [the defendant] was responsible for [a death or serious bodily injury] by bringing about a situation so unnecessarily dangerous to human life that empowering government to exercise its most ominous authority is the only rational societal response."  *Id.* at 470.

Drake. **See Commonwealth v. Stokes**, 38 A.3d 846, 853 (Pa. Super. 2011) (it is not within province of this Court to re-weigh evidence and substitute our judgment for that of fact-finder); **Commonwealth v. Mobley**, 14 A.3d 887, 889–90 (Pa. Super. 2011) (same).

Further, Major's argument that the Commonwealth did not disprove self-defense beyond a reasonable doubt is also meritless. Major's testimony wavered between defending herself against Drake, who was considerably larger than her and had been drinking alcohol prior to the argument, and stating that Drake "lunged" at her and accidentally "walked into the knife." N.T. Trial, 11/15/16, at 173; N.T. Trial, 11/16/16, at 87-88; N.T. Trial, 11/17/16, at 176-77, 109, 258-63. The jury was free to believe all, part, or none of her testimony. **See Troy**, **supra**. **See also Commonwealth v. Hinchcliffe**, 388 A.2d at 1070-71 (malice and self-defense are mutually exclusive; where evidence is sufficient to prove malice, prosecution has also met burden of disproving self-defense).

The evidence presented at trial and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, support Major's third-degree murder conviction. Her challenge to the sufficiency of the evidence, therefore, is meritless. **See Commonwealth v. Marks**, 704 A. 2d 1095, 1098 (Pa. Super. 1997) (if record contains support for verdict, it may not be disturbed); **see also Commonwealth v, Jackson**, 485 A.2d 1102, 1104 (Pa. 1984) (what may appear unlikely to reviewing court cannot supplant what fact finder has found).

In her final two issues, Major claims she is entitled to a new trial because: (1) the trial court erred in overruling her objection to the medical examiner's testimony that the victim's death was not an accident; and (2) the trial court erred in denying her motion for a mistrial due to the prosecutor's improper remarks at summation.

Based on our review, we conclude that Judge McDermott's opinion comprehensively discusses and properly resolves these two remaining issues. **See** Trial Court Opinion, 4/25/17, at 8-14. Accordingly, we rely on the trial court's opinion to dispose of these claims, and we direct the parties to attach a copy of that opinion in the event of further proceedings.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 11/21/2017*

**IN THE COURT OF COMMON PLEAS**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CRIMINAL TRIAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA     :   CP-51-CR-0012151-2015

       : 

       : 

v.        : 

       :   **FILED**

       : 

TIA JORDAN-MAJOR        :   APR **2 5** 2017

**OPINION**     Office of Judicial Records
Appeals/Post Trial



CP-51-CR-0012151-2015 Comm. v. Jordan-Major, Tia
Opinion

**McDermott, J.**                                            **April 25, 2017**

7938237141

**Procedural History**

On September 29, 2015, the Defendant, Tia Jordan-Major, was arrested and charged with

Murder and Possession of an Instrument of Crime ("PIC"). On November 14, 2016, the

Defendant appeared before this Court and elected to be tried by a jury. On November 18, 2016,

the jury convicted the Defendant of Third-Degree Murder and found her not guilty of PIC.

On January 27, 2017, with the benefit of a presentence report,[1] this Court sentenced the

Defendant to six-and-a-half to thirteen years imprisonment for Third-Degree Murder. On

February 24, 2017, the Defendant filed a Notice of Appeal. On March 19, 2017, the Defendant

filed a timely Rule 1925(b) Statement of Matters Complained on Appeal.

**Facts**

According to Todd Collier, on January 24, 2015, between 6 and 7 p.m., he and Frederick

Drake (the decedent) stopped at Charlie B's, a bar and grill at Broad and Ruscomb Streets in

Philadelphia. While Drake and Collier drank, there was a power outage at the bar. The

Defendant, Drake's paramour, told detectives in a statement on January 25, 2015, that during the

---

[1] The Defendant waived any mental health evaluations prior to sentencing.

outage, Drake texted her saying "Come get me, 911, at Charlie [B], hurry." N.T., 11/15/2016 at 102, 139; N.T., 11/16/2016 at 81; N.T., 11/17/2016 at 162–63.

Shortly thereafter, the Defendant called Drake on the phone. A few minutes later, the Defendant arrived at Charlie B's, and, according to Keyocha Brisbon, a bartender that night, the Defendant exclaimed "what the f[*]ck y'all sitting here in the dark for?" After the Defendant yelled, "Come on, let's go," Drake paid his tab and left. N.T., 11/15/2016 at 103–10, 144–47; N.T., 11/16/2016 at 233.

In her statement to detectives, the Defendant said that after she and Drake were home from the bar, they argued over his missing cell phone and keys.[2] The Defendant also told detectives that, at some point, she went into the basement with her daughter to avoid a confrontation. Later, at around 10 p.m. that night, the Defendant called Mary Drake, the decedent's mother. The Defendant told Mary that she and her son were arguing because her son could not find his keys, which the Defendant believed were outside.[3] Mary heard her son talking in the background about keys. The Defendant also told Mary that her son had "mugged"[4] her daughter, Danielle Johnson. The call between the Defendant and Mary ended after Drake had calmed down. N.T., 11/15/2016 at 226–30; N.T., 11/16/2016 at 81–86; N.T., 11/17/2017 at 44, 88, 170–76.

After the call ended with Drake's mother, the arguing continued. According to the Defendant's statement, while she was in the dining room, Drake slapped and choked her; then he pulled her by the hair into the kitchen. While in the kitchen, Drake allegedly choked her again.

---

[2] The Defendant testified that she found the decedent's cell phone in her car the day after the murder. N.T., 11/17/2017 at 156.
[3] Police later found the keys outside of 5310 Tabor Road on a walkway leading up to the property's front steps. N.T., 11/16/2016 at 26.
[4] At trial, "mugged" was described as a pushing of someone's head or the shoulder with a hand. N.T., 11/15/2016 at 229.

2

When he backed up, the Defendant said that she grabbed a knife from a kitchen counter rack, held it in front of her with her right hand, and told Drake to leave her alone. The Defendant claimed that Drake responded, "What are you going to do with that? I'm a real n[*]gger. I'm not scared of you." Then, according to the Defendant, Drake lunged toward her and walked into the knife. Police Officer Joseph Shookla, one of the first to respond to the Defendant's home that night, testified that the Defendant did not have any injuries and he did not find a knife. N.T., 11/15/2016 at 168–71, 196; N.T., 11/16/2016 at 85–92.

Frederick Drake was pronounced dead eight hours later on January 25, 2015, at 6:45 a.m., at Albert Einstein Medical Center. Deputy Medical Examiner Dr. Albert Chu, who performed the autopsy, testified that Drake had a stab wound to his left upper chest, near the collarbone, which injured the left axillary artery and vein, causing extensive bleeding. The stab wound was five inches deep, slightly downward. The cause of death was a stab wound to the chest and the manner of death was homicide. N.T., 11/15/2016 at 71–74, 78–81.

The morning after the stabbing, the Defendant waived her *Miranda* rights and told detectives that, in addition to being scared, she grabbed the knife because "[she] just wanted him to just leave [her] alone. Leave. Go sit down. Go be with the bitches you were talking about. [She] just didn't want to be beat. [She had] been in abusive relationships before. [And she] shouldn't have to go through that no more." 11/16/2016 at 73–74, 81–91; N.T., 11/17/2016 at 207.

At trial, the Defendant presented character witnesses who testified to her peacefulness, honesty, and law-abiding reputation. In addition to character testimony, the Defendant also presented her daughter, Daniel, who witnessed some of the argument between Drake and the Defendant. Daniel confirmed that the Defendant went to the basement during the argument to

3

avoid a confrontation, and that, at times, the argument between the Defendant and Drake was physical. Daniel, however, refuted that Drake had "mugged" her. She testified that although Drake "kind of" elbowed her in the face when she tried to get between him and her mom, he did not "mug" her. N.T., 11/16/2016 at 44, 189–214; N.T., 11/17/2017 at 35–70, 88.

The Defendant also testified at trial, where she offered an additional reason, to the ones she told detectives, for the argument. She testified that when she and Drake arrived home after the bar that night, he wanted to have sex, and that she did not because she was menstruating. The Defendant alleged that after she said "no" to sex, Drake slapped her. In addition to never mentioning this to detectives, the Defendant also never mentioned it to Drake's mother when she called to complain about her son. N.T., 11/15/2016 at 226–30; N.T., 11/16/2016 at 74, 81–86; N.T., 11/17/2016 at 44, 170, 174.

The Defendant also testified that the stabbing was an accident, and that it was not until Drake backed up from the knife that she saw extensive bleeding from his chest. According to the Defendant, Drake did not know he was stabbed until he looked down. The Defendant said that after Drake saw the bleeding he said "give me a kiss." After she kissed him, the Defendant said, he fell unconscious to the kitchen floor. The Defendant then ran to a neighbor's house for help and her daughter dialed 911. When the 911 dispatcher asked Daniel if the stabbing was an accident, Daniel did not respond. Daniel can be heard in the background asking the Defendant if the stabbing was an accident. N.T., 11/16/2016 at 186; N.T., 11/17/2016 at 89, 183–85, 263.

**Discussion**

The Defendant challenges the sufficiency of the evidence for Third-Degree Murder. Specifically, the Defendant claims there was no evidence of malice. The Defendant also claims

4

that she acted in self-defense; or, in the alternative, that the victim's death was an accident, in that the victim may have lunged into the knife while attacking her.

Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Baumhammers*, 960 A.2d 59, 68 (Pa. 2008). The Commonwealth may sustain its burden of proving each element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Commonwealth v. Estepp*, 17 A.3d 939, 943 (Pa. Super. 2011) (*citing Commonwealth v. Brooks*, 7 A.3d 852, 856–57 (Pa. Super. 2010)). The fact-finder is free to believe all, part, or none of the evidence, and credibility determinations rest solely within the purview of the fact-finder. *Commonwealth v. Treiber*, 874 A.2d 26, 30 (Pa. 2005). The Superior Court considers all the evidence admitted, without regard to any claim of wrongly admitted evidence. *Commonwealth v. Kane*, 10 A.3d 327, 332 (Pa. Super. 2010). The Superior Court will also not weigh the evidence or make credibility determinations. *Id.*

Third-Degree Murder is "all other kinds of murder" other than First-Degree or Second Degree-Murder. *Commonwealth v. Marquez*, 980 A.2d 145, 148 (Pa. Super. 2009); *see also* 18 Pa.C.S. § 2502(c). The elements of Third-Degree Murder, developed by case law, are a killing done with legal malice. *Marquez, supra (citing Commonwealth v. MacArthur*, 629 A.2d 166 (Pa. Super 1993). Malice for Third-Degree Murder is defined as:

> wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured[.] Malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury. Malice may be inferred by considering the totality of the circumstances.

5

*Commonwealth v. Thompson*, 106 A.3d 742, 757 (Pa. Super. 2014).

In the case at bar, there was more than sufficient evidence that the Defendant stabbed the decedent with the requisite malice for Third-Degree Murder. As this Court charged the jury, "when deciding whether the defendant acted with malice, [the jury] should consider all the evidence regarding [the Defendant's] words, conduct, and the attending circumstances that may show her state of mind." N.T., 11/18/2016 at 137. Within hours of the stabbing, the Defendant told detectives that, in addition to being scared, she grabbed the knife because "[she] just wanted him to just leave [her] alone. Leave. Go sit down. Go be with the bitches you were talking about. [She] just didn't want to be beat. [She had] been in abusive relationships before. [And she] shouldn't have to go through that no more." N.T., 11/16/2016 at 91; N.T., 11/17/2016 at 207. These statements—which exemplify anger or resentment—demonstrate the Defendant's state of mind and the context of her decision to pick up the knife. It was, therefore, reasonable for the jury to conclude that the Defendant acted recklessly and consciously disregarded an unjustified and extremely high risk by introducing the knife into her argument with Drake, who was unarmed. *See Thompson, supra.* Based on their verdict, the jury credited this evidence rather than the Defendant's self-serving testimony and trial counsel's theory of the case.

Further, by stabbing Drake with a knife in a vital body part, his chest, a jury could reasonable infer that she acted with the requisite malice for Third-Degree Murder. *Commonwealth v. Truong*, 36 A.3d 592, 598 (Pa. Super. 2012) (*citing Commonwealth v. Gooding*, 818 A.2d 546, 550 (Pa. Super. 2003)). For the foregoing reasons, this claim warrants no relief.

Next the Defendant argues that because the jury did not convict the Defendant of PIC, this indicates that she did not have criminal intent at the time she armed herself with the knife.

6

This claim is without merit as courts have held that inconsistent verdicts are not grounds for reversal of convictions. *See, e.g., Commonwealth v. Moore*, 103 A.3d 1240, 1250 (Pa. 2014) (holding that "although [the Defendant's] murder and attempted murder acquittals may be logically inconsistent with [the Defendant's] PIC conviction, in light of our enduring acceptance of inconsistent verdicts in Pennsylvania, we conclude that the acquittals are not grounds for reversal of [the Defendant's] PIC conviction."). No relief, therefore, is due.

The Defendant also claims that she is entitled to a new trial after this Court overruled defense counsel's objection to the Commonwealth's hypothetical to the Deputy Medical Examiner about the manner in which the stabbing occurred:

> [THE COMMONWEALTH:] And assume for sake of argument I am approximately 5'4", without heels, I'm approximately 5'4" [the Defendant's height], and if I was to stab a person who is, say, 6 feet tall, the height of my decedent, and I am right-handed, would that be consistent with, say, someone actually like going above the head and stabbing?
>
> [DR. ALBERT CHU:] Yes.

N.T., 11/15/2016 at 74–75.

The Defendant argues that the hypothetical was based on facts not introduced in evidence. The admissibility of evidence rests within the "sound discretion of the trial court," and its decision will not be reversed unless there is a showing that it abused its discretion. *Commonwealth v. Chmiel*, 889 A. 2d 501 (Pa. 2005) (*citing Commonwealth v. Boczkowski*, 846 A.2d 75 (Pa. 2004)). It is well-settled that a hypothetical need not be based on every fact in the record. *Commonwealth v. Roberts*, 437 A.2d 948, 951 (Pa. 1981). Further, if counsel believes that relevant facts for a hypothetical have been omitted, he is "free on cross-examination to pose his own hypothetical question which includes those facts." *Id.*

7

This claim is meritless as every fact in the Commonwealth's hypothetical was properly admitted into evidence.[5] The Defendant is 5 foot 4. N.T., 11/16/2016 at 96. The decedent was six feet tall. N.T., 11/15/2016 at 70. The Defendant testified to holding the knife in her right hand. N.T., 11/17/2016 at 254–55. The stab wound in Drake's chest, five inches deep, was slightly downward. N.T., 11/15/2016 at 72–74. Dr. Chu, an expert in forensic pathology, testified that there were two ways the knife could have penetrated the decedent creating the downward-angle wound—either his torso was upright and the knife penetrated his chest from an overhand motion; or his body was angled forward as he lunged, and a knife, horizontally-oriented, created the wound. N.T., 11/15/2016 at 76. For these reasons, no relief is due.

The Defendant also claims that this Court erred when it overruled defense counsel's objection to Dr. Chu's testimony that the victim's death was not an accident. N.T., 11/15/2016 at 77–78. The Defendant argues that it is the jury's exclusive function to determine whether the victim's death was an accident. Following the Commonwealth's question of Dr. Chu to whether the stabbing in the instant matter was accidental, trial counsel objected. This Court properly ruled that because a classification in the manner of death is whether it was accidental or a homicide, Dr. Chu could respond. N.T., 11/15/2016 at 77–78.

This issue is devoid of merit as Dr. Chu only reiterated what he had listed in his autopsy report. The manner of death offered from a qualified expert is generally admissible at trial. *See, e.g., Commonwealth v. Spots*, 756 A.2d 1139, 1160 (Pa. 2000). Further, Dr. Chu's conclusion on the manner of death was not blameworthy. *See Commonwealth v. Jacobs*, 639 A.2d 786 (Pa. 1994).[6] Dr. Chu later acknowledged that homicide means the death caused by one person of

---

[5] In addition to these facts being admitted into evidence, trial counsel was also permitted to ask Dr. Chu several hypotheticals. N.T., 11/15/2016 at 82–90.
[6] Where a forensic pathologist testified that the manners of death for a child who drowned and for a woman stabbed were homicide, the court held that "[t]o no extent did the expert indicate that homicides, in a legal sense, were

8

another person, and that he could not determine whether it was justified. N.T., 11/15/2016 at 89. As such, Dr. Chu's testimony was properly admitted.

The Defendant next claims that this Court erred in overruling defense counsel's motion for a mistrial after alleged improper closing remarks by the Commonwealth. In reviewing prosecutorial remarks to determine their prejudicial quality, the comments cannot be viewed in isolation, but must be considered in the context in which they were made. *Commonwealth v. Judy*, 978 A.2d 1015, 1019–20 (Pa. Super. 2009) (*citing Commonwealth v. Sampson*, 900 A.2d 887, 890 (Pa. Super. 2006)). A prosecutor has considerable latitude during closing arguments and her arguments are fair if supported by the evidence or use inferences that can be reasonably derived from the evidence. *Judy,* 978 A.2d at 1020 (*quoting Commonwealth v. Holley*, 945 A.2d 241, 250 (Pa. Super. 2008)).

Further, prosecutorial misconduct will not be found where comments were only oratorical flair. *Judy,* 978 A.2d at 1020. While it is improper for a prosecutor to express a personal belief as to the credibility of a witness, a prosecutor may comment on the credibility of a witness. *Commonwealth v. Chmiel*, 889 A.2d 501, 544 (Pa. 2005). Finally, a mistrial remedy is an "extreme remedy required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal." *Commonwealth v. Ragland*, 991 A.2d 336 (Pa. Super. 2010) (*quoting Judy,* 978 A.2d at 1019 (citations omitted)).

The Defendant claims that the Commonwealth committed prosecutorial misconduct when she informed the jury in closing arguments that it only had Third-Degree Murder to consider as a result of trial motions. N.T., 11/18/2016 at 73. At the end of closing arguments, trial counsel

---

involved. The expert's testimony established only that the victims did not succumb to self-inflicted causes of death." *Commonwealth v. Jacobs*, 639 A.2d 786 (Pa. 1994).

9

moved for a mistrial based on the Commonwealth's remarks, which this Court denied. N.T., 11/18/2016 at 108–12.

This claim warrants no relief as the Commonwealth explained to the jury in its opening statement that the Defendant was charged with First-Degree Murder and Voluntary Manslaughter. N.T., 11/15/2016 at 43, 46, 48. This was in the Commonwealth's purview, as the purpose of an opening statement is to "apprise the jury how the case will develop [and] its background and what will be attempted to be proved." *Commonwealth v. Parker*, 919 A.2d 943, 950 (Pa. 2007) (*quoting Commonwealth v. Montgomery*, 626 A.2d 109, 113 (Pa. 1993)). This Court, also in its purview, instructed the jury at the start of trial that they should not conclude that either counsel would necessarily be able to prove what they say they expect to prove, nor that this Court would necessarily permit such evidence to be introduced. N.T., 11/15/2016 at 35. In view of that, the Commonwealth informing the jury how they were to deliberate on just Third-Degree Murder was not prosecutorial misconduct, but a simple and appropriate explanation for the jury's edification on how they arrived at that sole charge.

Next, the Defendant claims that the Commonwealth committed prosecutorial misconduct when she stated in closing arguments that the Defendant had the "luxury of an appeal should she be found guilty." This claim misrepresents the record. During closing arguments, the Commonwealth stated:

> [Trial] Counsel spoke to you [the jury] about permanence and like saying whatever happens in this courtroom is, you know, it's permanent and it can never be erased. Wrong. There's a such thing as appeals, if somebody says and does something incorrect. But you know what's permanent? The death of Frederick Drake.

N.T., 11/18/2016 at 78.

10

As the record plainly reflects, the Commonwealth said nothing improper. First, the Commonwealth's remarks were merely a fair response to trial counsel's statements to the jury in closing arguments. Trial counsel had argued to the jury that their decision will be "etched in stone and last forever"; the "decision [ ] you're going to make today, there is no remedy from . . . it will last forever"; and that "there's no coming back [from that decision]." *See Commonwealth v. Culver*, 51 A.3d 866 (Pa. Super. 2012) (the Commonwealth is "entitled to comment during closing arguments on matters that might otherwise be objectionable or even outright misconduct, where such comments constitute fair response to matters raised by the defense, or where they are merely responsive to actual evidence admitted during a trial."); *see also* N.T., 11/18/2016 at 23. Second, the Commonwealth was not misleading the jury in its role as the fact-finder or in its ability to render a verdict, but merely explaining when appeals may be warranted. Finally, the Commonwealth in no way described the appeal process as a "luxury." This claim, therefore, is meritless.

The Defendant also claims that the Commonwealth committed prosecutorial misconduct when she called the Defendant a liar in closing arguments. N.T. 11/18/2016 at 77, 89. This claim is without merit as the Commonwealth did not arbitrarily attack the Defendant's character. Instead, to illustrate the Defendant's lack of credibility, the Commonwealth—with supporting evidence of inconsistencies in the Defendant's testimony—argued that she lied.

> [THE COMMONWEALTH:] Now, why [are statements taken by detectives] important? Because when Ms. Tia Jordan-Major got on the witness stand and testified, she lied. And I usually don't call witnesses 'liars.' But she lied about things that were material. Now, no one cares if there was a cup. That's not material. No one cares. This is not a case about breaking glass. No one cares about that. No one cares about the text messages. No one cares about any of that stuff because it's not material. He wasn't killed with a cup. He wasn't killed with a glass from a door. He wasn't killed with the rap music or any of these things. But the issue is, she lied about things

11

that were material. What's material to this case? The choking and the pulling of hair and how -- and the violence. That's what's important. That's what's [sic] material in this case. And here's the thing: You [the Defendant] had already given a statement. You had already said, look, he choked me and he pulled my hair. What else did you need to say? You had already had what you needed. You already said that, okay. But what does she do? She begins to embellish. And embellish is too kind of a word. She -- she lies. She begins to lie. What do you mean, Ms. Stokes? Okay. What's material?

. . .

So what does she say or what doesn't she not say in [her] statement [to detectives]? . . . She says -- she talks about, hey, when we got in the house, we went upstairs and he -- he slapped me. Okay. She put that in the statement. But she doesn't say, oh, he wanted to have sex with me and I was on my period and then he slapped me.

N.T., 11/18/2016 at 89–90. In addition, the Commonwealth also pointed out that, compared to her statement to police, the Defendant's trial testimony increased the number of times Drake allegedly choked her. N.T., 11/18/2016 at 91–92.

Following closing arguments, trial counsel objected to the Commonwealth's liar references, which this Court overruled. Because the Defendant's testimony contained numerous statements that were incongruent with her previous statement to the police, the Commonwealth was free to highlight these aspects to the jury. *See, e.g., Commonwealth v. Cox*, 863 A.2d 536 (Pa. 2004) (where the court found that the prosecutor's statements, supported by numerous discrepancies in the witness's testimony, regarding a witness lying were fair comments on the evidence and did not unreasonably inflame or incite the passions of the jury).

Although this Court overruled trial counsel's objection and, at the time, denied his request for an unspecified jury instruction, this Court did, in an abundance of caution, address the issue in its final jury charge. Therein, this Court highlighted the issue and properly informed the jury that counsels' personal opinions were not relevant. This Court also instructed the jury that

12

they, and they alone, determine what evidence is important, and that they are not bound by counsels' characterization of the evidence.

> [THIS COURT:] I just want to point out to you that during the prosecutor's closing, I mean, there was a reference to the defendant being a liar. I just want to remind you that, as with both attorneys, statements made by counsel and their personal opinions, their personal opinions are not particularly relevant. And in this particular case, the question is whether or not that comment was made as a fair response to the arguments made by defense counsel attacking credibility of the witnesses. But I just want to highlight that neither attorney's personal comments are appropriate, I mean, in terms of what their personal belief is. It's really about -- it's what you believe is important and you form the basis of your belief based on the evidence.

> So I just want you to remember that credibility in this case, as I've just spent ten minutes on with you, is an aspect that was in this case. And clearly there's been different versions given, and ultimately you have to reconcile the version. You have to determine the facts.

N.T., 11/18/2016 at 132–33. The jury is presumed to follow this Court's instructions.

*Commonwealth v. Tedford*, 960 A.2d 1, 37 (Pa. 2008) (*citing Commonwealth v. Speight*, 854 A.2d 450 (Pa. 2004)). Accordingly, this issue warrants no relief.

Finally, the Defendant claims that the Commonwealth committed prosecutorial misconduct when she stated in closing arguments that the victim could not speak for himself, but the jury could speak for him. N.T., 11/18/2016 at 106. The Commonwealth's statement was in no way prosecutorial misconduct as courts have found such language as unobjectionable. In *Commonwealth v. Hall*, the court in addressing a similar statement, that the victim was "forever silenced," stated that that remark was not misconduct as it was "an attempt by the prosecutor to explain to the jury the difficulty of proving the intent to kill and that such intent must be inferred from the facts and circumstances surrounding the killing since the victim cannot testify." 701 A.2d 190, 199 (Pa. 1997). Here, the Commonwealth's statement regarding the victim's

13

inability to speak for himself was true, supported by the evidence. Drake was deceased, and died as a result of a confrontation with the Defendant, who was charged with his murder. Like *Hall*, the intent to kill in the instant matter must be inferred from the facts and circumstances surrounding the victim's murder.

For the foregoing reasons, the Defendant's judgment of sentence should be affirmed.

BY THE COURT,

Barbara A. McDermott, J

14

*Commonwealth v. Tia Jordan-Major*
CP-51-CR-0012151-2015

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing filing upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa. R. Crim. P. 114:

Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
Attn: Deborah Watson-Stokes

**Type of Service:** **DA's Courthouse Assigned Box**

Tia Jordan-Major
OZ0816
SCI Muncy
P.O. Box 180
Muncy, PA 17756

**Type of Service:** **Certified Mail**

Mitchell Strutin
Strutin and Smarro
1515 Market Street
Ste 1200
Philadelphia, PA 19102

**First Class Mail**

**Dated: April 25, 2017**

**R. Christopher Campbell, Esq.**
**Judicial Clerk to the**
**Honorable Barbara A. McDermott**