J-S12013-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KYLE KRESGE | : | |
| | : | |
| Appellant | : | No. 2222 EDA 2019 |

Appeal from the Judgment of Sentence Entered March 19, 2019
In the Court of Common Pleas of Monroe County Criminal Division at
No(s): CP-45-CR-0000519-2017

BEFORE: SHOGAN, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY SHOGAN, J.: **FILED SEPTEMBER 04, 2020**

Appellant, Kyle Kresge, appeals from the judgment of sentence imposed on March 19, 2019.[1] Following a bench trial, the trial court found Appellant guilty of murder in the third degree, abuse of a corpse, and tampering with physical evidence.[2] After review, we affirm.

The trial court set forth the following summary of facts:

> On February 14, 2017[,] at approximately 12:30 P.M., Pennsylvania State Police were notified of a 911 hang-up call. The caller spoke the words "he's dead" and hung up. After the call was

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Although Appellant purported to appeal from the order denying his post-sentence motion, "[i]n a criminal action, an appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions." **Commonwealth v. Shamberger**, 788 A.2d 408, 410 n.2 (Pa. Super. 2001)(*en banc*). Thus, we have corrected the caption accordingly.

[2] 18 Pa.C.S. §§ 2502(c), 5510, and 4910(1), respectively.

traced, Pennsylvania State Police arrived at 1289 Glenwood Road in Monroe County. (N.T. Trial, 12/11/18, at 35.) A woman waved down Trooper George Tessitore, the first trooper on the scene, but was unable to tell him what happened. He parked in front of [Appellant's] white pickup truck, which had a utility trailer attached. (N.T. Trial, 12/11/18, at 36.)

[Appellant] moved about in front of the house, pacing, unable to stand still and profusely sweating. He was repeating, "I told [Lawrence Purcell ("Victim" or "the Victim")] not to come here." (N.T. Trial, 12/11/18, at 36, 48.) [Appellant] told the trooper there was a dead person on his front porch. The trooper found no body there, or at the side porch where [Appellant] then led him. But standing there, [Appellant] pointed down to a pile of debris and told the trooper the Victim's body lied underneath. (N.T. Trial, 12/11/18, at 36-37.) EMTs arrived and found a white male lying face down in the snow still warm to the touch, with a blanket wrapped around him covered by a tarp held down by a wooden pallet. (N.T. Trial, 12/11/18, at 39, 60.) The Victim … was wearing a black T-shirt bunched up around his neck and boxers pulled down to his ankles, with dried blood about his mouth and nose. (N.T. Trial, 12/11/18, at 39.) Attending physicians pronounced the Victim dead at the hospital. The cause of death was a single gunshot wound to the chest. (N.T. Trial, 12/12/18, at 99.)

Trooper Tessitore continued to ask what happened, but [Appellant] could not give a coherent answer. (N.T. Trial, 12/11/18, at 39.) An EMT checking the Victim's body for vital signs recalled [Appellant] calling him a "shitbag" over and over, saying how the Victim was a drug addict who had just gotten out of jail. (N.T. Trial, 12/11/18, at 62.) The trooper secured [Appellant] at the scene and searched his person. Pertinently, he [found] in a cargo-shorts pocket a spent .22. (N.T. Trial, 12/11/18, at 42.)

Troopers searched the house and property for two days. Entering through the front door, they observed a single bullet hole piercing a ceiling-fan blade and continuing into the ceiling of the entranceway. (N.T. Trial, 12/11/18, at 154.) In [Appellant's] makeshift bedroom, Trooper Thomas Slavin recovered a large, sturdy flashlight with the shape and size of a baseball bat. According to several witnesses, the Victim had brought this club-

like object into the house and had it on him, nearby, or somewhere else when [Appellant] killed him.

Trooper Tessitore found blood on the carpet leading to the side door, and on the side-door patio, in the vicinity where the Victim's body was hidden beneath its tarp. (N.T. Trial, 12/11/18, at 106.) Outside, upon a pile of wood within 30 feet of the dump site, he found a pair of jeans with a belt whose buckle had been ripped from the end where it normally attaches. (N.T. Trial, 12/11/18, at [132-34.) He also found a length of rope, in which was knotted a noose or snare, which could be tightened around an object in order to drag it. (N.T. Trial, 12/11/18, at 144-45.) When they continued the search outdoors, he and fellow troopers noticed that a gunpowder-sniffing canine had [a] hit by a woodpile covered by a tarp weighed down with an aluminum pole and tire. They observed a shovel lying nearby with wet dirt on the blade. Removing the tarp, they could see disturbed ground filling in a depression. They dug a shallow hole about 6 inches down and found a .22 revolver in a holster. (N.T. Trial, 12/12/18, at 72-73, 77.) They found three discharged cartridges in the cylinder, out of a total load of nine. Eight of the nine, including the three discharged rounds, carry the "A" manufacturer's mark. (N.T. Trial, 12/12/18, at 77-78.) Detectives were later able to trace this weapon back to a person who stole it. This person traded it to a friend who traded it to [Appellant]. (N.T. Trial, 12/12/18, at 139, 144-46, 153, 164-65.)

[Appellant] and the Victim [had] a colorful history. Three State Troopers were familiar with [Appellant's] address, as they had responded there before. (N.T. Trial, 12/11/18, at 9-12, [32] -34, 73-74.) [Appellant] had called 911 multiple times looking for round-the-clock protection[]. (N.T. Trial, 12/11/18, at 33-34.) In February of 2017, he called 911 after the Victim sent texts threatening to rob [Appellant]. When police arrived, they found both men at the house telling them it was all a misunderstanding. (N.T. Trial, 12/11/18, at 9-12.) But by the date of the murder, [Appellant] had made it clear that the Victim was not welcome at his house.

On the day the Victim died, [Appellant] with his friends had been enjoying a sleepless drug binge that continued over several days. They had been manically cleaning up and organizing the property since the night before. Approaching the time when the Victim arrived, [Appellant] was outside with Mary Jo Dredger

("Dredger"). Inside the house, Travis Koehler ("Koehler") was recovering from a seizure with his girlfriend, Deanne Galasso ("Galasso"). The Victim also had a history with Koehler. The Victim had his friend Joshua Lee ("Lee") drive him to [Appellant's] house when he learned Koehler was there so he could confront him. On the way, he hyped himself by rapping about how he would beat and kill Koehler.

The Commonwealth called Detective Wendy Serfass to introduce surveillance video footage from a convenience store approximately one minute's drive away from [Appellant's] house. (N.T. Trial, 12/11/18, at 205.) In chronological order, the video first show[ed] the Victim arriving at the store in a blue Volkswagen Jetta with Lee and Destinee Dalrymple ("Dalrymple"). Next, the Jetta back[ed] out of the parking space and wait[ed] at a stoplight to enter Gilbert Road, where [Appellant's] house is situated. The white truck identified as [Appellant's] pass[ed] the intersection shortly after, driving away from [Appellant's] house. Approximately 45 minutes later, the same truck return[ed] past the mart and turn[ed] onto Gilbert Road toward[] [Appellant's] home. (N.T. Trial, 12/11/18, at 201-03.)

When the Victim arrived at the house, he and [Appellant] exchanged words or glances. One witness said it was something to the effect of "get the fuck off my property." [Appellant] got into a white truck with a utility trailer and drove off "like a bat out of hell." The [Victim] with Lee and Dalrymple then walked inside the house, the Victim carrying his flashlight-bat with him. He intended to get Koehler outside so they could fight. He taunted him with threats and more of his belligerent rapping, while Koehler remained seated at the kitchen table, with Galasso attempting to de[-]escalate the situation.

Some 45 minutes later, consistent with the surveillance video, [Appellant] returned in his truck and went inside. At some point, [Appellant met] the Victim in the hallway leading back from the front door, adjacent to the kitchen with Koehler and Galasso. [Appellant] was now armed. He fire[d] once toward the ceiling, perhaps as a warning shot. He fired the second bullet that killed the Victim within a short time later. Lee testified that at the time he heard the second shot, the Victim was no closer to [Appellant] than 10 to 15 feet, and [Appellant] was able to maintain his distance. Ballistics and pathological evidence would show that the gun was not in or near contact with the Victim's clothing. (N.T.

- 4 -

Trial, 12/13/18, at 195-214; N.T. Trial, 12/12/18, at 133.) None of the investigators reported signs of a struggle at the scene, and troopers did not find the flashlight-bat in the front entranceway where the Victim was killed or on or near Victim's body. [Appellant] appeared visibly unharmed when troopers photographed him in execution of a search warrant. (N.T. Trial, 12/12/18, at 24-25.)

After the gunshots, the others present scatter[ed] from the scene. Lee was in his car leaving with Dalrymple when [Appellant] ran up to him and told him to recover his friend, saying the Victim "was fine." Koehler and Galasso were making their own way from the scene.

According to the forensic pathologist, Dr. Bollinger, a single shot mortally wounded the Victim, and he remained alive more than one minute but no longer than 10 to 15 minutes. (N.T. Trial, 12/12/18, at 103-04.) In addition to the fatal wound, the autopsy revealed a pattern of blunt-force injuries around the Victim's head, neck, and chest on his left-hand side. (N.T. Trial, 12/12/18, at 107-08.) The Victim's body suffered some of these injuries at or shortly after the time of death, as the biological response to the injuries reveals a failure but not complete loss of circulation. (N.T. Trial, 12/12/18, at 121.) She opined that these injuries are consistent with being dragged across the ground by a rope, or with similar rough handling. (N.T. Trial, 12/12/18, at 110, 117, 123-24.)

The Commonwealth called Trooper Joseph Gober as an expert in firearm and tool mark examination. He testified that the projectile recovered at autopsy was too mutilated for a definitive match with any one weapon, but it was of the same type and caliber that the revolver fires. (N.T Trial, 12/13/18, at 177, 179.) He opined that he could identify the shell casings found buried with the weapon with the one recovered from [Appellant's] pocket. Both contained distinctive tool marks imparted by the unique wear or machining pattern on the firing hammer. (N.T. Trial, 12/13/18, at 180-85.)

The [c]ourt specifically found that [Appellant] had not acted in self-defense or even in imperfect self-defense. [Appellant] having dragged the Victim's body across the ground, possibly beating it or stripping it naked, and concealing it outside in a pile of trash justifies his conviction for Abuse of a Corpse. We found

- 5 -

[Appellant] guilty of Tampering with Physical Evidence for concealing the murder weapon, and burying it so that dirt and moisture would have caused its evidentiary value to deteriorate.

*Eyewitness Testimony*

Witnesses Galasso and Lee testified on the third day of trial. Their testimony allowed us to reconstruct the events that led to [Appellant] killing the Victim. These witnesses were present to see and hear the events in proximity to [Appellant] and the Victim.

Galasso testified that she, [Appellant], Koehler, and others had been getting high on meth and heroin together and decided they would clean up [Appellant's] property. They organized the place for several days and nights. (N.T. Trial, 12/13/18, at 1-[20].) On the day the Victim died, Koehler had a seizure early in the morning, and Galasso was helping him recover. (N.T. Trial, 12/13/18, at 24[-25].)

While Koehler was quietly composing himself at the kitchen table trying to eat, the Victim entered through the front door to confront him for some unexplained reason. The Victim spat a battle rap at Koehler and threatened to beat him. [Appellant] was not inside the house while this was happening. (N.T. Trial, 12/13/18, at 33-36.

Galasso saw the Victim carrying a flashlight the size and shape of a baseball bat, but did not describe it as a weapon. (N.T. Trial, 12/13/18, at 62.) He came in with it in his hand, but the witness saw him put it in his back pocket, and the Victim might have set it down later. She could not say whether the Victim was holding it when [Appellant] shot him. (N.T. Trial, 12/13/18, at 62[-63].)

[Appellant] came back inside some time later and ordered the Victim to leave. Two people piled through the door behind the Victim. Galasso described [Appellant's] "crazed and mad" countenance, yelling at the Victim to "get the fuck out." (N.T. Trial, 12/13/18, at 36.) Not long after he returned, [Appellant] fired a warning shot into the ceiling. In the courtroom, Galasso stated she saw [Appellant] point the gun upward, and she identified an image of the impact hole as located in the part of the ceiling above where [Appellant] stood when he fired. (N. T. Trial, 12/13/18, at 67.) With the first shot, Koehler got up and pushed Galasso

further back into the kitchen to remove her from the things escalating. Koehler and Galasso got on the ground. Galasso did not remember how much time elapsed between the first and second shots. It was enough for she and Koehler to get settled in a position where she could see [Appellant] shoot the Victim, and this must have taken "a very short period of time." (N.T. Trial, 12/13/18, at 71.) She testified that the two men were probably two or three feet apart, though she recalled having reported earlier that the Victim was on top of [Appellant]. (N.T. Trial, 12/13/18, at 68, 72.) [Appellant] raised his arm, and the Victim received the fatal shot and hit the floor. (N.T. Trial, 12/13/18, at 67, 71.)

After they heard the second shot and saw the Victim fall, Galasso and Koehler slipped through the side door and headed toward the road. (N.T. Trial, 12/13/18, at 38.) They saw [Appellant] later the same day, and he had no bruises, marks, or scratches on his face and hands, and nothing else she thought suggested he had been in a fight. (N.T. Trial, 12/13/18, at 41.)

After Galasso's testimony, the Commonwealth called Lee. Lee gave Victim a ride to [Appellant's] place in his blue Jetta, along with Dalrymple. During the ride, Victim had been performing a rap about how he was going to kill someone named Travis Koehler. (N.T. Trial, 12/13/18, at 78.) Lee did not know [Appellant] at that time. Upon their arrival, Lee remembers this person he did not know approach the Victim from a white truck and tell him to "get the fuck off" the property. (N.T. Trial, 12/13/18, at [81].) Victim walked toward this person carrying "an aluminum bat with a flashlight in one of the ends." (N.T. Trial, 12/13/18, at 81.) After the initial confrontation, the second man got in the truck and drove "out of dodge" through the lawn. (N.T. Trial, 12/13/18, at 81- 82.) Victim then entered the house. Lee could not say exactly what happened when Victim went inside, because he remained in his car scratching through the floor mats for pieces of drugs. (N.T. Trial, 12/13/18, at [84].)

Victim called for Lee to come inside while Lee was growing uncomfortable with the atmosphere of confrontation. Lee wanted to leave but was afraid to abandon Victim and Dalrymple. (N.T. Trial, 12/13/18, at 113[].) Inside, Lee found Victim "terrorizing" a man and woman in the kitchen. (N.T. Trial, 12/13/18, at 85.) As Lee tried to persuade Victim to get back in the car, he [saw] the white truck return to the driveway. (N.T. Trial, 12/13/18, at

113, 116.) Victim held the baton flashlight as [Appellant] came through the front door and again told Victim to "get the fuck out." (N.T. Trial, 12/13/18, at [113-114].)

As Victim stood off with [Appellant], Lee moved away from both men through the hallway toward the back of the house. The witness heard a loud noise. Then he froze and looked around. He started toward the front door when he heard another loud sound. (N.T. Trial, 12/13/18, at 90-91.) At the time of the second shot, Lee was moving around past Victim and [Appellant] toward the front door. (N.T. Trial, 12/13/18, at 91.) He estimated they were about 10 to 15 feet apart. (N.T. Trial, 12/13/18, at 99.) He could not say how close Victim ever came to [Appellant], but [Appellant] "was not trying to let him get very close." (N.T. Trial, 12/13/18, at 109.) Lee ran back to his car, where Dalrymple was waiting. They were trying to get themselves away from the situation until the man Lee saw with the gun ran to the car and told him his friend was fine, that he needed to drive back up to recover him. (N.T. Trial, 12/13/18, at 92-93.) He stayed in the car while Dalrymple ran inside. (N.T. Trial, 12/13/18, at 95.) She came running back out after about 10 seconds saying the Victim [was] shot and [was] bleeding out. (N.T. Trial, 12/13/18, at 96.)

Trial Court Opinion, 7/26/19, 3-12. Following the nonjury trial, the trial court found Appellant guilty of murder in the third degree, abuse of a corpse and tampering with evidence. After a pre-sentence investigation, the trial court sentenced Appellant to an aggregate term of eighteen to thirty-six years of incarceration. Order, 3/19/19. Appellant filed a timely post-sentence motion on March 28, 2019, which the trial court denied on July 26, 2019. Appellant filed a timely notice of appeal, and both the trial court and Appellant complied with Pa.R.A.P. 1925.

Appellant presents the following questions for our review:

1. Whether the evidence was insufficient to convict [Appellant] of Third Degree Murder because the Castle Doctrine established a complete defense to the homicide charges?

- 8 -

2. Whether the evidence was insufficient to convict [Appellant] of Third Degree Murder where the evidence established a complete self-defense to the homicide charges, assuming the Castle Doctrine was inapplicable?

3. Whether the evidence was insufficient to convict [Appellant] of the Third Degree Murder in absence of malice and voluntary manslaughter would have been the appropriate charge on which to convict [Appellant] if self-defense doctrines were inapplicable in part or in whole?

4. Whether the evidence was insufficient to convict [Appellant] of abuse of corpse?

5. Whether the evidence was insufficient to convict [Appellant] of tampering with evidence?

6. Whether the trial court erred by permitting the Commonwealth to introduce evidence of telephone calls between [Appellant] and his mother while incarcerated, shortly after arrest, when such calls had no evidentiary value?

7. Whether the trial court erred by permitting the Commonwealth to introduce a request for medical treatment submitted by [Appellant] at the Monroe County Correctional Facility when the evidence was irrelevant and/or introduced in violation of HIPPA regulations where [Appellant] never consented to the release of the medical information at the prison for purposes of trial?

Appellant's Brief at 5.[3]

In each of Appellant's first five issues, he argues that the evidence was insufficient to sustain his convictions. Appellant's Brief at 16-31. Our standard for review of a sufficiency of the evidence claim is as follows:

_____

[3] We note that although Appellant presents seven issues in his statement of issues for appellate review, the argument section of his brief is comprised of a single, seventeen-page argument, in violation of Pa.R.A.P. 2119(a). Appellant's Brief at 16-34.

When presented with a claim that the evidence was insufficient to sustain a conviction, an appellate court, viewing all of the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth as the verdict winner, must determine whether the evidence was sufficient to enable the fact-finder to find that all elements of the offense were established beyond a reasonable doubt.

*Commonwealth v. Woody*, 939 A.2d 359, 361 (Pa. Super. 2007) (citation omitted). "Furthermore, '[t]he Commonwealth may sustain its burden by proving the crime's elements with evidence which is entirely circumstantial and the trier of fact, who determines credibility of witnesses and the weight to give the evidence produced, is free to believe all, part, or none of the evidence.'" *Id.* at 361–362 (quoting *Commonwealth v. Brown*, 701 A.2d 252, 254 (Pa. Super. 1997)). "As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record." *Commonwealth v. Vogelsong*, 90 A.3d 717, 719 (Pa. Super. 2014). "Additionally, we may not reweigh the evidence or substitute our own judgment for that of the factfinder." *Commonwealth v. Walker*, 139 A.3d 225, 229 (Pa. Super. 2016).

In support, Appellant posits that the evidence is insufficient to sustain his conviction for third-degree murder because the castle doctrine provided a "complete defense" to the homicide charges brought against him. Appellant's Brief at 16. "The castle doctrine is a specialized component of self-defense, which recognizes that a person has no duty to retreat from his or her home before using deadly force as a means of self-defense." *Commonwealth v.*

*Childs*, 142 A.3d 823, 824 n.1 (Pa. 2016). It was codified at 18 Pa.C.S. § 505(b)(2.1):

> **(b) limitations on justifying necessity for use of force.--**
>
> * * *
>
> > (2.1) Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:
> >
> > > (i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.
> > >
> > > (ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

18 Pa.C.S. § 505(b)(2.1). Section 505(b)(2.2) sets forth the following limitations on the use of the castle doctrine:

> (2.2) The presumption set forth in paragraph (2.1) does not apply if:
>
> > (i) the person against whom the force is used has the right to be in or is a lawful resident of the dwelling, residence or vehicle, such as an owner or lessee;
> >
> > (ii) the person sought to be removed is a child or grandchild or is otherwise in the lawful custody or under the lawful guardianship of the person against whom the protective force is used;

> **(iii) the actor is engaged in a criminal activity or is using the dwelling, residence or occupied vehicle to further a criminal activity; or**
>
> (iv) the person against whom the force is used is a peace officer acting in the performance of his official duties and the actor using force knew or reasonably should have known that the person was a peace officer.

18 Pa.C.S. § 505(b)(2.2) (emphasis added).

Although Appellant argues that the castle doctrine provides a complete defense, he admits that the doctrine does not apply if the actor/defendant was engaged in criminal activity when he shot the Victim. Appellant's Brief at 14. During Appellant's trial, Appellant stipulated that he was designated a person not to possess firearms. N.T., 12/12/18, at 174-75. Thus, because Appellant illegally possessed the firearm he used in the commission of the crime, Appellant was engaged in criminal activity when he shot the Victim. In *Commonwealth v. Cannavo*, 199 A.3d 1282 (Pa. Super. 2018), this Court found that the unlawful possession of a firearm renders the castle doctrine presumption inapplicable. *Id*. at 1290. Therefore, Appellant's illegal possession of the firearm used to kill the Victim precludes application of the castle doctrine. *Id*. Appellant is due no relief on this claim of error.

Appellant next argues that the evidence was insufficient to convict him of third-degree murder because the evidence established that he was acting in self-defense when he killed the Victim. Appellant's Brief at 25. In order to prove that self-defense justified the use of deadly force, the actor must show:

(a) [the defendant] reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat.

**Commonwealth v. Mouzon**, 53 A.3d 738, 740 (Pa. 2012) (quotation omitted). The Commonwealth sustains the burden of negation,

if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that [he] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him]self therefrom; or that the slayer violated a duty to retreat or avoid the danger.

**Id**. (quotation omitted).

In support of his argument, Appellant avers that the Victim "bull-rushed" Appellant and lunged at him as if to tackle him. Appellant's Brief at 26. Appellant also claims that the Victim was holding the flashlight/bat in his hand when he approached Appellant. **Id**. Although Appellant states that the Victim had the flashlight/bat in his hand at the time of the confrontation, there was also testimony from a witness that after the Victim entered the home with the flashlight/bat, he put the flashlight/bat down before Appellant returned to the residence. N.T., 12/12/18, at 62-63.[4] Indeed, as the trial court found in its opinion,

---

[4] This testimony differs from the testimony given by another eyewitness, who testified that the Victim had the flashlight/bat in his hand when Appellant returned home. N.T., 12/12/18, at 116-117.

- 13 -

The [c]ourt heard no testimony that the Victim used the flashlight as a club against [Appellant] or anyone else or threatened to use it. None of the eyewitnesses describe the Victim brandishing his flashlight-club or making any physical moves toward[] [Appellant] while holding it. The testimony conflicts over whether the Victim was even holding it at the time [Appellant] shot him down. This blunt object seems to have traveled between his hand, his back pocket, [Appellant's] makeshift bedroom, and somewhere on the floor if we consider all the testimony. The object was not found in the area where the Victim fell, on his person, or near his clothes, suggesting he was not holding it when he died. Drawing the reasonable inferences in the Commonwealth's favor, it remains unknowable whether the Victim was "armed[,]" which goes against [Appellant's] reasonable belief in a need to defend himself. While the flashlight-baton may seem like an inherently menacing object when an uninvited guest brings it to one's home, the evidence does not allow us to conclude that the Victim was attacking [Appellant] with it at the time of the fatal shot.

Drawing all reasonable inferences in the Commonwealth's favor, we find the evidence sufficient to prove that the Victim had not posed a threat of imminent death or serious bodily injury at the time [Appellant] killed him. This disproves the reasonable-belief element of self defense. *See Mouzon*, 53 A.3d at 740.

Trial Court Opinion, 7/26/19, at 16-17. Additionally, the trial court found that Appellant acted inconsistently with someone who believed he needed to use immediate deadly force to prevent death or serious bodily injury. *Id*. at 17. Specifically, the court looked to the fact that Appellant safely left his home after the Victim arrived, returned with his revolver, and killed the Victim shortly thereafter. *Id*. The trial court found that Appellant was not without fault during the confrontation, noting that Appellant was described as "crazed and mad" when he returned with the revolver and that Appellant was the first person on the property to use a weapon. *Id*. at 18. Finally, the court found that statements made by Appellant and the concealment of the Victim's body

- 14 -

were inconsistent with self-defense. Thus, the trial court found that Appellant's claim of self-defense failed. *Id*. at 21.

It is well established that we will employ a deferential standard of review when determining whether the evidence was sufficient to sustain a conviction. *Commonwealth v. Brown*, 52 A.3d 1139, 1163-1164 (Pa. 2012). Moreover, we will not reassess the credibility of witnesses, nor will we reweigh the evidence or substitute our judgment for that of the factfinder. *Commonwealth v. Akhmedov*, 216 A.3d 307, 322 (Pa. Super. 2019) (*en banc*). We will not disturb the verdict unless the "evidence is [so] weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Id*. at 322 Given the trial court's findings in the instant case, we find the evidence is sufficient to establish that Appellant was not acting in self–defense when he killed the Victim.

Appellant also argues that the evidence adduced at trial was insufficient to prove he committed third-degree murder because he did not act with malice when he shot the Victim. Appellant's Brief at 27. "Third degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." *Commonwealth v. Truong*, 36 A.3d 592, 597 (Pa. Super. 2012) Malice is defined as "not merely ill-will, but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty." *Id*. at 597-598. "Malice may be found where the actor consciously disregards

an unjustified and extremely high risk that the actor's conduct might cause death or serious bodily injury." ***Akhmedov***, 216 A.3d at 322.

Appellant claims that he "acted with an unreasonable belief that the killing was necessary" and that both Appellant and the Victim were "hyped" over the situation. Appellant's Brief at 28. (citing 18 Pa.C.S. § 2503 (b) ("A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.")). Appellant cites to no case law discussing the application of Section 2503.

The trial court found that as fact-finder, it may infer malice from circumstances of the act that resulted in death, specifically the use of a lethal weapon upon a vital part of the victim's body. Trial Court Opinion, 7/26/19, at 23 (citing ***Commonwealth v. Gardner***, 416 A.2d 1007, 1008 (Pa. Super. 1980) and ***Truong***, 36 A.3d at 598 (Pa. Super. 2012)). In its opinion, the trial court found Appellant did not believe he needed to kill the Victim in order to preserve his own life:

> 1.) [Appellant] did not feel such an imminent danger that he must escape it, as he safely left his house for 45 minutes in order to equip himself with a revolver, and then chose to return to confront the person allegedly threatening his life; 2.) [Appellant's] immediately confronting the Victim with a firearm, while the Victim was not attacking him with his flashlight-bat is more consistent with his desire to drive him off the property by force or threat, than to defend himself; 3.)[Appellant's] treatment of the

> Victim's body, his statement to first responders on the scene, to Lee, and to his Mother are not consistent with an honest conviction that the Victim died so [Appellant] might live. Even supposing [Appellant] did believe this, the fact that he instigated the conflict with the Victim by brandishing a weapon and firing a warning shot at the ceiling makes a justification defense unavailable… .

Trial Court Opinion, 7/26/19, at 23. For the reasons set forth by the trial court and our well-established deferential standard of review, we conclude that the evidence is sufficient to find Appellant acted with malice when he shot the Victim. **See Commonwealth v. Palmer**, 292 A.2d 921, 923 (Pa. 1972) ("Malice is properly implied when a deadly weapon is directed to a vital part of the body"). Appellant is due no relief on this issue.

Appellant next argues that the evidence was insufficient to sustain his conviction for abuse of a corpse. Appellant's Brief at 29. Abuse of a corpse is defined as a person's treatment of a "corpse in any way he knows would outrage normal family sensibilities." 18 Pa.C.S. § 5510. This Court has found the evidence sufficient to support abuse of a corpse where an individual concealed the body from authorities and left it in the elements. **Commonwealth v. Hutchinson**, 164 A.3d 494, 498 (Pa. Super. 2017). Appellant admits that the treatment of the Victim, namely, dragging the Victim from Appellant's home, the removal of some of the Victim's clothes, as well as concealing the body under debris constitutes abuse of a corpse. Appellant's Brief at 29. Appellant posits, however, that there is no evidence, direct or circumstantial, that "point to the Appellant as the perpetrator of this crime." **Id**. Appellant further avers that the fact that he was aware of where the

- 17 -

Victim's body was when asked by the trooper is insufficient to prove that Appellant moved the body or directed the body to be moved. *Id*. at 30.

In its opinion, the trial court found that although Appellant claimed there was no evidence supporting the conviction, the weapon used by Appellant was found nearby the body. Trial Court Opinion, 7/26/19, at 25. The court also found it persuasive that Appellant was the only individual known to have been in control of the weapon, which investigators found concealed under a tarp in a nearly identical manner as the Victim's concealment. *Id*. Further, the trial court looked to the fact that there was no evidence that any other individuals remained at the property after the shooting. *Id*. The court also took note of the fact that

> so little time passed between death and discovery of the remains makes it highly improbable that any person not present at the time of the shooting, arrived, committed the maltreatment, and then fled. [Appellant] has not suggested that others were coming and going in the time after the Victim's death. With no evidence to the contrary and the involvement of a hypothetical third person already improbable, we will draw the reasonable inference that such a person was not involved. *See* [*Commonwealth v. Hagan*, 654 A.2d 541, 543 (Pa. 1995)] (all reasonable inferences in favor of the Commonwealth as verdict winner). If no other person was involved, then the evidence suffices to identify [Appellant] as the perpetrator.

Trial Court Opinion, 7/26/19, at 23. Once again, taking all reasonable inferences in favor of the Commonwealth, we find that Appellant has failed to show the evidence was insufficient to prove that he was the individual that abused the Victim's corpse.

Next, Appellant avers that the evidence was insufficient to support his conviction for tampering with evidence. An individual is guilty of tampering with evidence if that individual, believing an investigation is pending or about to be instituted, "alters, destroys, conceals or removes any record, document or thing with intent to impair its verity or availability in such proceeding…." 18 Pa.C.S. § 4910(1); *Commonwealth v. Toomer*, 159 A.3d 956, 961 (Pa. Super. 2017).

This argument is essentially a retread of the argument relating to his conviction for abuse of a corpse. Appellant's Brief at 30. Appellant again avers that there is no evidence that he buried the gun and that there were other individuals present who could have buried it. *Id*. As with his argument regarding abuse of a corpse, Appellant is challenging his identification as the individual who committed the crime. Appellant's Brief at 30. Specifically, he avers that because another unknown individual's DNA was found on the gun, it is more likely that someone other than Appellant buried the gun. *Id*. Appellant devotes two paragraphs to this issue and does not provide citation to any relevant case law. Thus, we find this issue waived. *Commonwealth v. Heilman*, 867 A.2d 542, 546 (Pa. Super. 2005).

Even if we reached the merits of Appellant's claim, we would find the evidence was sufficient to sustain the conviction. As the trial court found: 1) Appellant is the only person known to have possessed the weapon; 2) the other individuals present at the scene fled when Appellant shot the Victim; 3)

there is no evidence any other individual arrived after the shooting; and 4) the brief time between the shooting and the arrival of first responders made it unlikely that another individual arrived, buried the gun near the Victim, and then fled. Trial Court Opinion, 7/26/19, at 27. The trial court also observed that Appellant identified the location of the body, and that the gun was found in proximity to the body, concealed in a similar fashion. *Id*. Finally, the trial court noted that Appellant had spent shell casings from the murder weapon in his pocket when he was secured at the scene by police, further evincing his intent to remove or conceal evidence related to the gun. *Id*. Once again, viewing the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth as the verdict winner, we would find that the evidence was sufficient to support the conviction for tampering with evidence.

Appellant next asserts that the trial court erred when it permitted the introduction of telephone calls between Appellant and his mother because the information contained therein was prejudicial and irrelevant. Appellant's Brief at 31.[5] "The admissibility of evidence is vested in the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion."

---

[5] Although Appellant maintains that he objected to the introduction of this evidence, he fails to provide a citation to the transcript showing the same as required by Pa.R.A.P. 2119(e). We note that in its opinion, the trial court stated that it received the evidence over Appellant's objection. Trial Court Opinion, 7/26/19, at 29. The calls were admitted into evidence as Commonwealth's exhibits 71A, B, C, and D. Our independent review of the record confirms Appellant objected to the admission of the calls. *See* N.T., 12/12/18, at 184-189.

*Commonwealth v. Brown*, 839 A.2d 433, 435 (Pa. Super. 2003). "An abuse of discretion occurs when a trial court, in reaching its conclusions, overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Id*.

Appellant argues that the calls to his mother had no evidentiary value and served only to portray Appellant in an unflattering light because of the manner in which he spoke to his mother. Appellant's Brief at 31. Appellant further posits that "[t]here is no method to quantify the impact these calls had on the trial court." Appellant's Brief at 31. Specifically, he avers that the calls consist of him seeking an attorney, telling his mother he is innocent, and generally being unkind to his mother. *Id.* Although Appellant admits that "there is some laxity in a non-jury trial when ruling on evidentiary issues because it is presumed the court can decipher the wheat from the chaff," he claims the court can still be jaded by inflammatory evidence which is of no probative value. *Id*. This Court has held that the fact that a defendant had chosen to be "tried by a judge rather than a jury minimizes, if not eliminates, the potential for prejudice." *Commonwealth v. O'Brien*, 836 A.2d 966, 972 (Pa. Super. 2003); *See also Commonwealth v. Grimmel*, 863 A.2d 455, 462 (Pa. 2004) (noting that where an appellant's claim of prejudice is based upon "an assumption that the trial judge was unable to consider the evidence only for its intended evidentiary purpose. This assumption is contrary to settled law.").

In its opinion, the trial court found that the statements made by Appellant to his mother during the calls were relevant because they spoke to Appellant's belief that he killed the Victim in self-defense, and specifically whether there were any objective manifestations of that belief. Trial Court Opinion, 7/26/19, at 28. Indeed, the trial court found that the following statements by Appellant were relevant to that inquiry: Appellant's claims during the phone calls that he was not the one who shot the Victim; he was not in the house when the Victim was shot; he was glad he had called 911 to report the Victim had threatened him in the past; and on the day the Victim died, Appellant received a telephone call telling him Victim was in his house, but that as soon as he went inside, he heard gunshots. Trial Court Opinion, 9/23/19, at 29. The trial court found the above telephone calls:

> show how [Appellant] behaved unlike a person who sincerely believed they have killed in self defense. [Appellant] falsely claims he was not present when the Victim died, and that someone else fired the shots the witnesses heard. … The conspicuous absence of any reference by [Appellant] to the Victim attacking him, threatening him, or even scaring him also make it less likely that [Appellant] was in fear for his life at the time he killed. [The trial court] also found his consistent disparagement of the Victim probative of his mental state at the time of the killing.

*Id*. at 29-30.[6] After review, we find that the trial court did not abuse its discretion when it allowed the calls into evidence. Indeed, Appellant has failed

_____

[6] The trial court noted that although part of the telephone conversations referenced Appellant's exercise of his right to counsel, the court stated that it did not base any of its decision on those conversations. Trial Court Opinion,

to make any showing of bias, impartiality, or ill-will toward Appellant, and the trial court considered the evidence relevant to Appellant's state of mind when he shot and killed the Victim. Thus, Appellant is due no relief.

In his final question, Appellant posits that the trial court erred by allowing the introduction of a request for medical treatment by Appellant when he was at the Monroe County Correctional Facility on the ground that it was irrelevant and violated HIPAA regulations.[7] Appellant's Brief at 32.[8] In the request, Appellant claimed that he was drugged, stripped, sexually assaulted, and photographed by the Victim. Appellant asserts that this evidence is inappropriate, inflammatory, and irrelevant. *Id*. at 33. Appellant further argues that the medical request should not have been in the possession of the Commonwealth as Appellant never consented to the release of medical information nor did the Commonwealth obtain a subpoena for the same. *Id*.

---

7/26/19, at 30 (citing **Commonwealth v. Irwin**, 579 A.2d 955, 957 (Pa. Super. 1990)(court sitting as fact-finder in a nonjury trial is presumed to disregard irrelevant and prejudicial aspects of relevant evidence)).

[7] HIPAA is the abbreviation for the Health Insurance Portability and Accountability Act of 1996, a federal statute that provides for monetary fines and various terms of imprisonment for the wrongful disclosure of individually identifiable health information. 42 U.S.C. § 1320d-6; **T.M. v. Elwyn, Inc.**, 950 A.2d 1050, 1059 (Pa. Super. 2008).

[8] As with the previous issue, Appellant does not set forth where in the record he objected to the admission of this evidence. Following an independent review of the record, we located the portion of the transcript where Appellant objected to the introduction of the medical request. **See** N.T, 12/13/18, at 121-123.

In its opinion, the trial court noted that the Commonwealth introduced the evidence as a possible motive or as background on the relationship between Appellant and the Victim. Trial Court Opinion, 7/26/19, at 31. As discussed *supra*, to the extent the evidence could be viewed as prejudicial, we assume the trial court viewed the evidence for its intended evidentiary purpose.

Finally, even assuming the release of the information constituted a violation of the HIPAA regulations, which is not apparent in the instant case as the Commonwealth is not a covered entity, HIPAA does not create an evidentiary privilege whose violation requires suppression of evidence. ***Commonwealth v. Williams***, 176 A.3d 298, 317-318 (Pa. Super. 2017) (finding that the Commonwealth cannot violate HIPAA and that even if such a violation occurred, the appellant would not be entitled to the remedy of suppression). Appellant had no legal grounds upon which to claim the medical request should have been suppressed and is due no relief on those grounds.

For all the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/4/20

- 24 -